# Nos. 22-1193, 22-1194, 22-1195

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

MYLAN INC. & SUBSIDIARIES,

Petitioner-Appellee

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellant

---

ON APPEAL FROM THE DECISIONS OF
THE UNITED STATES TAX COURT

---

OPENING BRIEF FOR THE APPELLANT

---

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

ARTHUR T. CATTERALL  (202) 514-2937
CLINT A. CARPENTER    (202) 514-4346
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

# TABLE OF CONTENTS

**Page**

Table of contents.......................................................................i

Table of authorities ............................................................. iii

Statement of jurisdiction.........................................................1

Statement of the issue.............................................................2

Statement of related cases and proceedings ...........................3

Statement of the case ..............................................................3

    A.    Statutory and regulatory overview .........................5

        1.    Capitalization versus deduction under the Internal Revenue Code and regulations......................................6

        2.    FDA approval of generic drugs under the Hatch-Waxman Act .......................................................9

    B.    Mylan's claimed deductions of legal fees .............13

    C.    The Tax Court proceedings...................................15

Summary of argument .........................................................21

Argument:

Mylan's litigation expenses must be capitalized because Mylan incurred them to facilitate its acquisition of intangible assets..............24

    Standard of review .......................................................24

    A.    As the Tax Court recognized, the regulation requires capitalization of expenses that Mylan incurred "in the process of . . . pursuing"—or to otherwise "facilitate" obtaining—effective FDA approvals of its paragraph IV ANDAs..........................................26

**Page**

B.  Mylan's litigation expenses facilitated its acquisition of effective FDA approvals of its paragraph IV ANDAs because Mylan incurred them in the process of pursuing those transactions ..................................................29

1.  Section 271(e)(2) litigation is part of the statutory process that Congress prescribed for pursuing FDA approval to market and sell a generic before the brand-name patents expire ....................................30

2.  Section 271(e)(2) litigation expenses are incurred in the process of pursuing effective FDA approval of paragraph IV ANDAs whether or not such litigation is a "step" in the approval process ..............34

3.  The tax treatment of patent-litigation expenses incurred outside the context of acquiring an intangible is irrelevant .................................40

C.  The regulatory examples support the Commissioner's position ...................................................44

D.  Requiring Mylan to capitalize its litigation expenses is consistent with the purpose of I.R.C. § 263 ..........................48

Conclusion..............................................................50

Certificate of bar membership ...............................51

Certificate of compliance .......................................52

Statutory and regulatory addendum ......................53

-iii-

# TABLE OF AUTHORITIES

**Cases:**                                                                     **Page(s)**

*aaiPharma Inc. v. Thompson,*
   296 F.3d 227 (4th Cir. 2002) .................................................. 10

*Addressograph-Multigraph Corp. v. Commissioner,*
   4 T.C.M. (CCH) 147 (1945) ...................................................... 19

*Am. Stores Co. & Subs. v. Commissioner,*
   114 T.C. 458 (2000) ................................................ 40, 41, 43, 44

*Anderson v. Commissioner,*
   698 F.3d 160 (3d Cir. 2012) .................................................... 24

*Apotex, Inc. v. Thompson,*
   347 F.3d 1335 (Fed. Cir. 2003) ............................................... 10

*Cap. Blue Cross v. Commissioner,*
   431 F.3d 117 (3d Cir. 2005) .................................................... 24

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
   566 U.S. 399 (2012) ............................................................... 10

*Commissioner v. Idaho Power Co.,*
   418 U.S. 1 (1974) ..................................................... 6, 7, 41, 49

*Conn. Gen. Life Ins. Co. v. Commissioner,*
   177 F.3d 136 (3d Cir. 1999) .................................................... 24

*F. Meyer & Bro. Co. v. Commissioner,*
   4 B.T.A. 481 (1926) ............................................................... 19

*FTC v. Actavis, Inc.,*
   570 U.S. 136 (2013) .................................... 9, 10, 11, 12, 13

*Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.,*
   988 F.2d 476 (3d Cir. 1993) .................................................... 24

*Hosp. Corp. of Am. & Subs. v. Commissioner,*
   348 F.3d 136 (6th Cir. 2003) ................................................... 24

*INDOPCO, Inc. v. Commissioner,*
   503 U.S. 79 (1992) ................................................... 6, 7, 44, 49

*Lychuk v. Commissioner,*
   116 T.C. 374 (2001) ............................................................... 40

**Cases (continued):**                                    **Page(s)**

*Metro Leasing Dev. Corp. v. Commissioner,*
   376 F.3d 1015 (9th Cir. 2004) ............................................. 24

*Mylan Labs., Inc. v. Thompson,*
   389 F.3d 1272 (Fed. Cir. 2004) .......................................... 13

*Purepac Pharm. Co. v. Thompson,*
   354 F.3d 877 (D.C. Cir. 2004) ............................................ 13

*Urquhart v. Commissioner,*
   215 F.2d 17 (3d Cir. 1954) ........................................ 18, 40, 41, 42, 43

*Woodward v. Commissioner,*
   397 U.S. 572 (1970) .................................................... 18, 20, 42, 43, 45

**Statutes:**

21 U.S.C.:

   § 355(a) .......................................................................... 28
   § 355(d) ............................................................................. 9
   § 355(j)(2)(A)(ii) ............................................................ 10
   § 355(j)(2)(A)(iv) ........................................................... 10
   § 355(j)(2)(A)(vii)(III) ................................................... 11
   § 355(j)(2)(A)(vii)(IV) ................................................... 11
   § 355(j)(2)(B) ................................................................. 11
   § 355(j)(4) ...................................................................... 38
   § 355(j)(5)(A) ................................................................. 10
   § 355(j)(5)(B) ........................................................... 10, 28
   § 355(j)(5)(B)(iii) ...................................................... 12, 32
   § 355(j)(5)(B)(iv) ........................................................... 13

35 U.S.C.:

   § 271(e)(1) ...................................................................... 34
   § 271(e)(2) ................................................................ *passim*

**Statutes (continued):** <span style="float:right">**Page(s)**</span>

Internal Revenue Code (26 U.S.C.):

§ 161.................................................................................. 6

§ 162........................................................................... 14, 19

§ 162(a) ................................................................. 6, 17, 41

§ 167................................................................................. 7

§ 197............................................................................ 7, 15

§ 263......................................................................... 48, 49

§ 263(a) ............................................................... 6, 7, 15

§ 1001(a) ....................................................................... 7

§ 6212.............................................................................. 1

§ 6213(a) ........................................................................ 2

§ 6214.............................................................................. 2

§ 7442.............................................................................. 2

§ 7482.............................................................................. 2

§ 7483.............................................................................. 2

Drug Price Competition and Patent Term Restoration
   (Hatch-Waxman) Act of 1984,
   Pub. L. No. 98-417, 98 Stat. 1585................................................. *passim*

**Other Authorities:**

5 Bittker & Lokken, *Federal Taxation of Income,*
   *Estates & Gifts* ¶ 106.1.2 (3d ed. 2012) ................................................ 42

21 C.F.R.:

§ 314.107(a) ....................................................... 28

§ 314.107(g) ....................................................... 13

Advance Notice of Proposed Rulemaking,
   67 Fed. Reg. 3461 (Jan. 24, 2002) ........................................ 7

Federal Rule of Appellate Procedure 13(a)(1)(A) ....................................... 2

Rev. Rul. 77-204, 1977-1 C.B. 40 ........................................................ 48

## Other Authorities (continued):                          Page(s)

T.D. 9107, 2004-1 C.B. 447, 69 Fed. Reg. 436 (Jan. 5, 2004) ................ 48

Treasury Regulations (26 C.F.R.):

  § 1.263(a)-4 .................................................................... 7, 19, 44
  § 1.263(a)-4(b)(1) ...................................................................... 29
  § 1.263(a)-4(b)(1)(ii).............................................. 9, 25, 26, 27, 29
  § 1.263(a)-4(b)(1)(v) ......................... 8, 15, 25, 26, 27, 29, 39, 40
  § 1.263(a)-4(b)(v) ...................................................................... 34
  § 1.263(a)-4(d)(1) ......................................................... 9, 26, 27
  § 1.263(a)-4(d)(5) ...................................................................... 29
  § 1.263(a)-4(d)(5)(i)............................... 9, 15, 25, 26, 27, 28
  § 1.263(a)-4(e)(1)................................................. 36, 37, 39
  § 1.263(a)-4(e)(1)(i) ...................................................... *passim*
  § 1.263(a)-4(e)(3)................................................................ 8, 36
  § 1.263(a)-4(e)(4)(iii) ................................................................ 36
  § 1.263(a)-4(e)(5), Example 4............................. 20, 42, 45, 46
  § 1.263(a)-4(e)(5), Example 7......................................... 36
  § 1.263(a)-5 ............................................................... 19, 44
  § 1.263(a)-5(a) ........................................................................ 48
  § 1.263(a)-5(b)(1) ............................................................. 44, 48
  § 1.263(a)-5(c)(4) .............................................................. 19, 48
  § 1.263(a)-5(l), Example 10.............................................. 42, 46, 47
  § 1.263(a)-5(l), Example 18............................................... 19, 47

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

Nos. 22-1193, 22-1194, 22-1195

MYLAN INC. & SUBSIDIARIES,

Petitioner-Appellee

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellant

———————————

ON APPEAL FROM THE DECISIONS OF
THE UNITED STATES TAX COURT

———————————

OPENING BRIEF FOR THE APPELLANT

———————————

## STATEMENT OF JURISDICTION

The Commissioner of Internal Revenue mailed notices of

deficiency under § 6212 of the Internal Revenue Code (26 U.S.C.)

(I.R.C.) to Mylan Inc. & Subsidiaries (collectively, "Mylan") for the years

2012–2013 and 2014 on September 23, 2016 and November 17, 2016,

respectively.  (A18.)[1]  On December 19, 2016, Mylan timely filed

petitions for redetermination of the deficiencies in the United States

Tax Court.  (A13, A18, A69, A87, A105); *see* I.R.C. § 6213(a).  The Tax

Court had jurisdiction under I.R.C. §§ 6213(a), 6214, and 7442.

On November 2, 2021, the Tax Court entered final decisions that

disposed of all parties' claims.  (A50–55.)  On January 28, 2022, within

90 days after entry of the decisions, *see* I.R.C. § 7483; Fed. R. App. P.

13(a)(1)(A), the Commissioner timely filed notices of appeal.  (A56–67.)

This Court has jurisdiction under I.R.C. § 7482.

## STATEMENT OF THE ISSUE

Under federal tax law, drug manufacturers must capitalize the

expenses they incur in the process of pursuing, or to otherwise facilitate

obtaining, FDA approvals.  Congress has created a process for obtaining

FDA approval to market and sell new generic drugs *before* the brand-

name drug patents expire, but only if, as part of that process, the

generic manufacturer invites the patentholders to sue it for

infringement and contests any suits that are brought.  The issue

---

[1] "A" references are to the pages of the appendix submitted with
this brief.

presented is whether the litigation expenses that Mylan incurred in defending against such infringement suits must be capitalized.  (A28–30, A32–48.)

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court.  Counsel for the Commissioner are aware of the following cases pending in other courts that involve an issue substantially the same, similar, or related to the issue in this appeal:

*Actavis LLC v. Commissioner*, No. 18732-19 (T.C.)

*Actavis Labs., FL, Inc. v. United States*, No. 1:19-cv-798 (Fed. Cl.)

*Actavis Labs. FL, Inc. v. Commissioner*, No. 2254-20 (T.C.)

*Perrigo Co. v. United States*, No. 1:17-cv-737 (W.D. Mich.)

*TEVA Pharms. USA, Inc. v. Commissioner*, No. 17680-19 (T.C.)

## STATEMENT OF THE CASE

This case concerns not *whether*, but *when* Mylan is entitled to deduct certain litigation expenses that it incurred as part of a congressionally prescribed process for obtaining FDA approval to market and sell generic versions of brand-name drugs before the patents on the brand-name drugs expire.  During the years 2012–2014,

-4-

Mylan pursued a number of such approvals, which required Mylan to certify to the FDA that the patents for the brand-name drug were either invalid or would not be infringed by Mylan's generic version and to then give notice of that certification to the patentholders.  The patentholders were then entitled by statute to sue Mylan for infringement and thereby trigger a statutory period of 30 months in which any subsequent FDA approval of Mylan's generic would be ineffective (and the patentholders' monopoly would thus be maintained) while the suit was litigated.

Mylan incurred substantial legal fees in preparing the required notice letters and defending itself against the infringement suits that followed, all of which Mylan deducted (as ordinary and necessary business expenses) on its income tax returns for the years in which the fees were incurred.  But after an audit, the Commissioner disallowed those deductions, determining that Mylan's legal fees were incurred to facilitate the creation of intangible assets (*i.e.*, the FDA approvals) and were therefore capital expenditures, which must be capitalized and deducted ratably over a multi-year (in this case, 15-year) amortization period.  As a result, the Commissioner determined that Mylan owed deficiencies in tax for the years 2012–2014 totaling $50 million.

-5-

Mylan petitioned the Tax Court for a redetermination of the deficiencies, and after a trial, the court sustained the Commissioner's determinations only in part.  The court agreed with the Commissioner that the fees for the notice letters must be capitalized because Mylan incurred them to facilitate its acquisition of the sought-for drug approvals.  But the court concluded that the infringement litigation was distinct from the FDA approval process, and that the fees Mylan incurred in that litigation—which far exceeded the notice-letter fees— were therefore not capital expenditures, but rather ordinary and necessary business expenses that Mylan had properly deducted in the years incurred.  As a result, the Tax Court entered decisions holding Mylan liable for deficiencies totaling less than $2 million.  The Commissioner now appeals from those decisions.  Mylan did not cross-appeal.

### A.    Statutory and regulatory overview

Because these appeals turn on the interplay of complicated tax rules and the even more complicated process for approval of generic drugs, we begin with a brief summary of the applicable law.

-6-

### 1. Capitalization versus deduction under the Internal Revenue Code and regulations

Section 162(a) of the Internal Revenue Code (26 U.S.C.) authorizes a deduction for "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 263(a), however, prohibits such deductions for capital expenditures. And to the extent a given capital expenditure may also be considered an "ordinary and necessary" business expense, § 263(a) takes precedence over § 162(a) and bars the deduction. *See* I.R.C. § 161; *see also Commissioner v. Idaho Power Co.*, 418 U.S. 1, 17–18 (1974). Thus, deduction of expenses in the year incurred is the "exception[ ] to the norm of capitalization." *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

The hallmark of a capital expenditure is the expectation that it will produce significant economic benefits beyond the year in which it is paid or incurred. *See id.* at 86–87. Capital expenditures usually result in—or are incurred in connection with—the acquisition, creation, or enhancement of a separate identifiable asset. *See id.* And in that circumstance, the amount of the expenditure is included in the tax basis of the corresponding asset, to be recovered later through depreciation or

-7-

amortization deductions, *see* I.R.C. §§ 167, 197, or as an offset to the amount realized upon a taxable disposition of the asset, *see* I.R.C. § 1001(a).[2]  Thus, the "primary effect" of classifying an expenditure as either a business expense or a capital expenditure goes only to the timing, not the availability, of cost recovery.  *INDOPCO*, 503 U.S. at 83. Section 263(a) simply "prevent[s] a taxpayer from utilizing currently a deduction properly attributable, through amortization, to later tax years when the capital asset becomes income producing," *Idaho Power*, 418 U.S. at 16; *see* Advance Notice of Proposed Rulemaking, 67 Fed. Reg. 3461, 3462 (Jan. 24, 2002) ("A fundamental purpose of section 263(a) is to prevent the distortion of taxable income [that would result from] current deduction of expenditures relating to the production of income in future years.").

In the case of intangible capital assets, the application of I.R.C. § 263(a) is governed by § 1.263(a)-4 of the Treasury Regulations (26 C.F.R.), which was issued in 2004.  As relevant here, the regulation

---

[2] Here, Mylan has conceded that if the legal expenses at issue are capital expenditures, then they are deductible over a 15-year amortization period under I.R.C. § 197.  (A48.)

treats as a capital expenditure—and therefore requires taxpayers to

capitalize—any "amount paid to facilitate (within the meaning of

paragraph (e)(1) of this section) an acquisition or creation of an

intangible described in . . . this section."  Treas. Reg. § 1.263(a)-

4(b)(1)(v).  And paragraph (e)(1) defines the "[s]cope of facilitate"

generally as follows:

> [A]n amount is paid to facilitate the acquisition or creation of
> an intangible (the transaction) if the amount is paid in the
> process of investigating or otherwise pursuing the
> transaction.  Whether an amount is paid in the process of
> investigating or otherwise pursuing the transaction is
> determined based on all of the facts and circumstances.  In
> determining whether an amount is paid to facilitate a
> transaction, the fact that the amount would (or would not)
> have been paid but for the transaction is relevant, but is not
> determinative.  An amount paid to determine the value or
> price of an intangible is an amount paid in the process of
> investigating or otherwise pursuing the transaction.

Treas. Reg. § 1.263(a)-4(e)(1)(i).[3]  As for the "described" intangibles to

which these rules apply, Treas. Reg. § 1.263(a)-4(b)(1)(v), they include,

most notably, "rights" that a taxpayer "obtain[s]" from "a governmental

---

[3] The regulation elsewhere adds that "the term *transaction* means
all of the factual elements comprising an acquisition or creation of an
intangible and includes a series of steps carried out as part of a single
plan."  Treas. Reg. § 1.263(a)-4(e)(3).

agency . . . under a trademark, trade name, copyright, license, permit, franchise, or other similar [agency-granted] right." Treas. Reg. § 1.263(a)-4(d)(5)(i); *see* Treas. Reg. § 1.263(a)-4(b)(1)(ii), (d)(1).

## 2. FDA approval of generic drugs under the Hatch-Waxman Act

In the Drug Price Competition and Patent Term Restoration Act of 1984, commonly called the Hatch-Waxman Act, Pub. L. No. 98-417, 98 Stat. 1585, Congress established a new, expedited process for obtaining FDA approval to market and sell generic copies of previously approved brand-name pharmaceuticals. Manufacturers of generic drugs had previously been subject to the same FDA approval procedure as their brand-name counterparts, which entails a "long, comprehensive, and costly testing process." *FTC v. Actavis, Inc.*, 570 U.S. 136, 142 (2013); *see* 21 U.S.C. § 355(d). But to implement Congress's purpose of bringing cheaper generic drugs to market, the Hatch-Waxman Act's expedited approach allows generic drug manufacturers to obtain FDA approval without the "costly and time-consuming studies" by submitting an Abbreviated New Drug Application (ANDA) "specifying that the generic has the 'same active ingredients as,' and is 'biologically equivalent' to, the already-approved

-10-

brand-name drug." *Actavis*, 570 U.S. at 142 (quoting *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012)); *see* 21 U.S.C. § 355(j)(2)(A)(ii), (iv).

At the same time, Congress sought to "strike a balance between" its objective of "'enabling competitors to bring cheaper, generic copies . . . to market'" and the competing objective of "'induc[ing] name-brand pharmaceutical firms to make the investments necessary to research and develop new drug products.'" *aaiPharma Inc. v. Thompson*, 296 F.3d 227, 230 (4th Cir. 2002) (citation omitted). So while generally requiring the FDA to approve or disapprove an ANDA within 180 days, 21 U.S.C. § 355(j)(5)(A), the Hatch-Waxman Act also tied the date on which an approval becomes *effective* to a new "streamlined mechanism for identifying and resolving patent issues related to the proposed generic products." *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1349 (Fed. Cir. 2003); *see* 21 U.S.C. § 355(j)(5)(B). Under these "special procedures," a generic-drug manufacturer must identify any patents covering the brand-name drug (as listed in the FDA's "Orange Book") and, if any of the patents are unexpired, submit with its ANDA one of two certifications. *Actavis*, 570 U.S. at 143. The

first option is a "paragraph III" certification requesting that the FDA make any approval to market the generic drug effective only upon the expiration of the patent. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(III).

More relevant here, however, is the alternative: a "paragraph IV" certification that the unexpired patent "is invalid or will not be infringed by the manufacture, use, or sale of the new [generic] drug for which the [ANDA] is submitted." 21 U.S.C. § 355(j)(2)(A)(vii)(IV); *see Actavis*, 570 U.S. at 143. A paragraph IV certification triggers yet another special process under the Hatch-Waxman Act, which enables upfront resolution of patent disputes while also having direct consequences for the timing of the FDA's approval to market the generic drug, including the potential for any such approval to become effective *before* the brand-name patent expires. The Act does that by (i) deeming a paragraph IV certification an act of patent infringement, 35 U.S.C. § 271(e)(2); (ii) requiring an applicant that makes a paragraph IV certification (a "paragraph IV applicant") to send a notification letter within 20 days to the brand-name drug patentee explaining in detail the factual and legal bases of the applicant's determination that the patent is invalid or will not be infringed, 21 U.S.C. § 355(j)(2)(B); and

(iii) entitling the patentee to prevent any FDA approval of the generic

from becoming effective for up to 30 months—and potentially until the

patent expires—by suing the applicant for infringement (a "Section

271(e)(2) suit") within 45 days of receiving the applicant's notification

letter, 21 U.S.C. § 355(j)(5)(B)(iii).  *See Actavis*, 570 U.S. at 143

(discussing this process and noting that making a paragraph IV

certification "often 'means provoking litigation'").

If the patentee prevails in such litigation within 30 months after

receiving the notification letter, then any FDA approval of the ANDA

will not become effective until the patent expires.  But otherwise,

approval will become effective before the patent expires, either (i) upon

resolution of the litigation in the applicant's favor, if such resolution

occurs prior to the expiration of the 30-month period; (ii) upon the

expiration of the 30-month period, if the litigation is still pending at

that time; or (iii) "immediately" (*i.e.*, upon issuance of the approval), if

the patentee fails to file suit within 45 days.[4]  21 U.S.C.

§ 355(j)(5)(B)(iii).

---

[4] Any FDA approval that becomes effective under the 30-month or
45-day rules, however, will lose its effective status until the patents

(continued…)

In addition to the prospect of obtaining FDA approval to market the generic before the brand-name patents expire, the Hatch-Waxman Act further incentivizes applicants to proceed under paragraph IV by granting a 180-day period of exclusivity to the first generic version of a brand-name drug that is approved with a paragraph IV certification. 21 U.S.C. § 355(j)(5)(B)(iv); *see Actavis*, 570 U.S. at 143; *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004). "During that period of exclusivity no other generic can compete with the brand-name drug," which can be a "valuable" benefit "possibly 'worth several hundred million dollars.'" *Actavis*, 570 U.S. at 143–44 (citation omitted).

## B.    Mylan's claimed deductions of legal fees

Mylan Inc. is the common parent of an affiliated group of corporations that files consolidated federal income tax returns. Mylan manufactures both brand-name and generic pharmaceuticals. (A13.) During the years at issue (2012–2014), Mylan regularly sought generic-

---

expire if a Section 271(e)(2) suit—brought within or without the 45-day period, as applicable—is subsequently resolved in favor of the brand-name patentee. *See* 21 C.F.R. § 314.107(g); *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272 (Fed. Cir. 2004).

-14-

drug approvals by submitting ANDAs with paragraph IV certifications.

(A13–14.)  Mylan recognized that paragraph IV certifications offered

both the earliest opportunity to bring its generic versions to market and

the possibility (in some cases) of first-to-file exclusivity, but it also

understood that such certifications often resulted in litigation.  (A14.)

Indeed, during the years at issue, Mylan defended itself in

approximately 120 infringement suits brought under Section 271(e)(2)

in response to its paragraph IV certifications, incurring substantial

legal fees.  (A13–14, A16.)  Mylan also incurred additional, but

significantly lower, legal fees during this period in preparing the notice

letters associated with its paragraph IV certifications.  (A14, A16.)

These two categories of Mylan's legal fees exceeded $46 million in 2012

and approached $40 million in both 2013 and 2014.  (A16.)

Mylan deducted those legal fees on its corresponding federal

income tax returns as ordinary and necessary business expenses under

I.R.C. § 162.  (A16–17.)  But the IRS (*i.e.*, the Commissioner) disallowed

those deductions on audit because it determined that the fees were

incurred to facilitate the creation of intangible assets (*i.e.*, FDA

approvals to market various generic drugs) and therefore constituted

nondeductible capital expenditures that must be capitalized under

I.R.C. § 263(a) and are subject to a 15-year amortization period under

I.R.C. § 197.  (A17–18.)  That treatment resulted in tax deficiencies of

$16.4 million for 2012, $12.6 million for 2013, and $21 million for 2014.

The IRS issued notices of deficiency to that effect, which Mylan

challenged in the Tax Court.  (A18.)

### C.    The Tax Court proceedings

The Tax Court consolidated the cases (A18) and received most of

the facts by stipulation (*see* A77, A83).  After a trial (which consisted

largely of expert testimony that the court ultimately deemed "not

necessary for the purposes of deciding these cases" (A18 n.4)), the court

issued an opinion sustaining the IRS's determination of the deficiencies

only as to Mylan's notice-letter fees and holding for Mylan as to its

litigation fees.  (A2–3, A47–48, A49.)

Consistent with the regulation, the court framed the capitalization

issue as whether Mylan's legal fees "were incurred to facilitate the

acquisition of a right obtained from a Government agency," which

depends on "whether the respective fees were paid in the process of

investigating or otherwise pursuing that transaction."  (A28); *see* Treas.

-16-

Reg. § 1.263(a)-4(b)(1)(v), (d)(5)(i), (e)(1)(i).  The parties agreed (A29)

that the right to market and sell a generic drug pursuant to an FDA-

approved ANDA with a paragraph IV certification is a right obtained

from a government agency that qualifies as an intangible.  And the Tax

Court adopted the IRS's definition of the relevant "transaction," which

the court articulated as "obtaining effective approval of an ANDA with

a paragraph IV certification," rather than obtaining approval without

regard to the effective date, as Mylan had argued.  (*Id.* (noting that

FDA approval "does not confer any rights on an applicant until it

becomes effective").)

The court then addressed whether the two categories of legal fees

at issue "facilitated" the transactions (as so defined) and must therefore

be capitalized.  (A31–41.)  The court quickly concluded that the notice-

letter fees facilitated the transactions, reasoning that Mylan incurred

those fees "'investigating or otherwise pursuing'" the transactions

because the preparation of notice letters "is a required step in securing

an FDA-approved ANDA for those applicants that make a paragraph IV

certification," *i.e.*, it is "a prerequisite for [such] approval."  (A32

(quoting Treas. Reg. § 1.263(a)-4(e)(1)(i)).)

-17-

But the court "reach[ed] a different conclusion with respect to Mylan's Section 271(e)(2) litigation expenses" (*id.*)—namely, that "expenses Mylan incurred in defending Section 271(e)(2) suits were not 'paid to facilitate' the transaction and are not required to be capitalized" (A41).  The court did not expressly address whether Mylan incurred those expenses in the process of pursuing the transactions.  The court relied instead on its conclusion that Section 271(e)(2) litigation, unlike notice-letter preparation, is not "a step in the ANDA approval process" (A33) and therefore "is not a step in obtaining effective FDA approval of an ANDA with a paragraph IV certification" (A41).  And having thus concluded that Mylan's litigation expenses were not capital expenditures, the court held that Mylan could deduct them as ordinary and necessary business expenses under I.R.C. § 162(a).  (A47–48.)

In rejecting the IRS's position that Mylan's Section 271(e)(2) litigation expenses facilitated the transactions within the meaning of the regulation, the court "note[d] that a Section 271(e)(2) suit is not [necessary] to obtain effective approval of an ANDA with a paragraph IV certification," since "a brand name drug manufacturer is under no obligation to initiate such a suit in response to" such an ANDA.  (A37.)

-18-

And the court also found relevant and persuasive its conclusion that

"Congress' decision to coordinate effective FDA approval with the

outcome of a Section 271(e)(2) suit does not convert such litigation into

a link in the ANDA approval chain"; rather, the "statutory coordination"

merely "ensures that the FDA does not run afoul of a District Court's

resolution of the intellectual property rights of the parties."  (A37–38.)

In the court's view, the judicially created "origin of the claim" test

also supported its conclusion.  In this context, the relevant inquiry

under the origin-of-the-claim test is "'whether the origin of the claim

litigated is in the process of acquisition' . . . of a capital asset."  (A41

(quoting *Woodward v. Commissioner*, 397 U.S. 572, 577 (1970)).)  The

court answered that question in the negative, finding that Section

271(e)(2) litigation expenses "ar[i]se out of actions initiated by patent

holders to protect their intellectual property from infringement."  (A41.)

Citing this Court's decision in *Urquhart v. Commissioner*, 215 F.2d 17

(3d Cir. 1954), the Tax Court noted that expenses incurred by a patent

holder in prosecuting a patent infringement suit are generally treated

as deductible business expenses.  (A42–43.)  And the court "s[aw] no

reason that Mylan should face different treatment" in defending against

-19-

such a suit, particularly since such "defensive" expenses "have been

found deductible in the past." (A43 (citing *F. Meyer & Bro. Co. v.*

*Commissioner*, 4 B.T.A. 481, 482 (1926), and *Addressograph-Multigraph*

*Corp. v. Commissioner*, 4 T.C.M. (CCH) 147, 166 (1945)).)

The Tax Court also considered regulatory examples illustrating

the scope of the term "facilitate" as used in Treas. Reg. §§ 1.263(a)-4

and 1.263(a)-5, respectively, and identified § 1.263(a)-5(l), Example 18,

as the most apposite example. (A46.) In that example, a corporate

defendant in multiple product-liability suits (X) filed a petition for

reorganization under Chapter 11 of the Bankruptcy Code in order to

manage all of the lawsuits in a single proceeding. Echoing § 1.263(a)-

5(c)(4) (which addresses this specific situation using the same

language), the example concludes that

> amounts paid by X to its outside counsel to prepare, analyze
> or obtain approval of the portion of X's plan of reorganization
> that resolves X's tort liability do not facilitate the
> reorganization and are not required to be capitalized,
> provided that such amounts would have been treated as
> ordinary and necessary business expenses under section 162
> had the bankruptcy proceeding not been instituted.

Treas. Reg. § 1.263(a)-5(l), Example 18 (¶ (ii)). The Tax Court "s[aw] a

strong parallel" to the case at bar, "where patent litigation is connected

with but distinct from the broader project of obtaining effective FDA approval of ANDAs with paragraph IV certifications," and found that "the conclusion reached by the example"—no capitalization—"thus attaches here."  (A46.)

The court rejected the IRS's reliance on Treas. Reg. § 1.263(a)-4(e)(5), Example 4.  (A47.)  In that example (which is based on the facts and holding of the *Woodward* case that the Tax Court cited elsewhere in its opinion), the majority shareholder (U) of a corporation was required by State law to buy out a minority shareholder who opposed a charter amendment.  When the parties could not agree on a purchase price, U brought a State court action to determine a fair price.  The example concludes that because the attorney, accountant, and appraisal fees incurred by U in connection with the negotiation and litigation helped to establish the purchase price of the minority interest, those fees facilitated the acquisition of that stock (a capital asset) and therefore must be capitalized.  Treas. Reg. § 1.263(a)-4(e)(5), Example 4.

But the Tax Court concluded that "the instant case is not comparable" to Example 4.  (A47.)  According to the court, "the principle illustrated by this example" is that "litigation expenses incurred to

establish a necessary element of the transaction (i.e., the purchase price) facilitate it and are subject to capitalization." (*Id.*)  And in the court's view, Section 271(e)(2) litigation expenses are "not incurred in connection with a necessary element of obtaining effective FDA approval but to resolve the question of patent rights." (*Id.*)

In accordance with its opinion and the parties' agreed computations, the Tax Court entered decisions reflecting tax deficiencies of $392,907 for 2012, $336,727 for 2013, and $1,231,359 for 2014. (A50–55.)

## SUMMARY OF ARGUMENT

As the Tax Court initially recognized, the issue in this case is whether Mylan's legal fees were incurred to "facilitate" the acquisition of effective FDA approvals of ANDAs with paragraph IV certifications, which depends, in turn, on whether the respective fees were paid "in the process of investigating or otherwise pursuing" such acquisitions. Under the Hatch-Waxman Act, a paragraph IV applicant that incurs Section 271(e)(2) litigation expenses *necessarily* does so in the process of pursuing effective FDA approval of its ANDA—in particular, approval that is effective *before* the brand-name drug patents expire.  Indeed,

obtaining pre-expiration approval is the only reason for an applicant to make a paragraph IV certification in the first place, and Congress made defending any Section 271(e)(2) infringement suits that are brought in response to the certification a prerequisite for such approval. Accordingly, the expenses Mylan incurred in defending against Section 271(e)(2) suits were incurred to facilitate its acquisition of effective FDA approvals and must therefore be capitalized.

In its analysis of those expenses, however, the Tax Court lost sight of the issue whether they were incurred in the process of pursuing the acquisitions, erroneously focusing instead on whether Section 271(e)(2) litigation is a "step" or "element" in the ANDA approval process. But that is not the issue. The issue is whether a paragraph IV applicant that actually incurs expenses in defending Section 271(e)(2) litigation does so in the process of pursuing the acquisition of effective approval of a paragraph IV ANDA. The Tax Court's observations that patentholders are not *obligated* to sue paragraph IV applicants for infringement under Section 271(e)(2), and that FDA approval with an effective date *after* the patents expire is available outside the paragraph IV process, are therefore beside the point.

Also irrelevant are cases holding that patent-litigation expenses are deductible outside the context of pursuing the acquisition of an intangible. Expenses incurred in patent litigation may well be deductible costs of doing business in most contexts. But unlike the litigants in ordinary infringement suits, a paragraph IV applicant that litigates a Section 271(e)(2) infringement suit does so to facilitate its acquisition of an intangible asset, which makes the expenses of that litigation capital expenditures. Moreover, requiring Mylan to capitalize its litigation expenses is also consistent with the judicially created origin-of-the-claim test, the regulatory examples, and the underlying purpose of the capitalization rules.

In short, the Tax Court erred in concluding that Mylan was not required to capitalize its litigation expenses. The decisions below should therefore be reversed and remanded to the Tax Court with instructions to enter decisions for the Commissioner in the amounts determined in the notices of deficiency.

# ARGUMENT

## Mylan's litigation expenses must be capitalized because Mylan incurred them to facilitate its acquisition of intangible assets

## Standard of review

This Court reviews the Tax Court's legal conclusions *de novo* and its factual findings for clear error. *Anderson v. Commissioner*, 698 F.3d 160, 164 (3d Cir. 2012) (citing *Cap. Blue Cross v. Commissioner*, 431 F.3d 117, 123–24 (3d Cir. 2005)). The Tax Court's interpretation of the Internal Revenue Code and the regulations thereunder is an issue of law reviewed *de novo. See, e.g.*, *Metro Leasing Dev. Corp. v. Commissioner*, 376 F.3d 1015, 1021 (9th Cir. 2004); *Hosp. Corp. of Am. & Subs. v. Commissioner*, 348 F.3d 136, 140 (6th Cir. 2003); *Conn. Gen. Life Ins. Co. v. Commissioner*, 177 F.3d 136, 143 (3d Cir. 1999). The Tax Court's application of facts to the Code and regulations is likewise reviewed *de novo. See, e.g.*, *Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 481 (3d Cir. 1993) ("Application of facts properly found to the governing legal principles receives plenary review.").

———————————

-25-

The question whether Mylan was required to capitalize its Section 271(e)(2) litigation expenses depends on whether Mylan incurred those expenses to "facilitate" its acquisition of effective FDA approvals of its paragraph IV ANDAs. *See* Treas. Reg. § 1.263(a)-4(b)(1)(ii), (v), (d)(5)(i). The Tax Court acknowledged as much (A28–30) but then focused its analysis on an altogether different question: whether Section 271(e)(2) litigation is a "step" in the ANDA approval process or, in other words, whether it is always *required* for effective FDA approval of a paragraph IV ANDA (A33–41). The regulation, in contrast, broadly defines the scope of facilitative expenses as including any amount that "is paid in the process of investigating or otherwise pursuing" the acquisition of the intangible. Treas. Reg. § 1.263(a)-4(e)(1)(i). And under the Hatch-Waxman Act, a paragraph IV applicant that incurs Section 271(e)(2) litigation expenses *necessarily* does so in the process of pursuing effective FDA approval of its ANDA—in particular, approval that is effective *before* the brand-name drug patents expire.

Thus, as we explain more fully below, Mylan did incur its Section 271(e)(2) litigation expenses "to facilitate the acquisition" of effective FDA approvals, Treas. Reg. § 1.263(a)-4(e)(1)(i), and those expenses

-26-

were therefore capital expenditures that Mylan was required to capitalize, Treas. Reg. § 1.263(a)-4(b)(1)(v).  The Tax Court's erroneous decision to the contrary should be reversed.

## A.    As the Tax Court recognized, the regulation requires capitalization of expenses that Mylan incurred "in the process of . . . pursuing"—or to otherwise "facilitate" obtaining—effective FDA approvals of its paragraph IV ANDAs

The regulation establishes three rules that control the capitalization question in this case.  *First*, a right obtained from a government agency "under a trademark, trade name, copyright, license, permit, franchise, or other similar [agency-granted] right" is an intangible capital asset.  Treas. Reg. § 1.263(a)-4(d)(5)(i); *see also* Treas. Reg. § 1.263(a)-4(b)(1)(ii), (d)(1).  *Second*, expenses paid to "facilitate" the "acquisition or creation" of such an intangible must be capitalized.  Treas. Reg. § 1.263(a)-4(b)(1)(v).  *And third*, "an amount is paid to facilitate the acquisition or creation of an intangible (the transaction) if the amount is paid in the process of investigating or otherwise pursuing the transaction."  Treas. Reg. § 1.263(a)-4(e)(1)(i).

Thus, as the Tax Court explained, the issue in this case is whether Mylan's legal fees "were incurred to facilitate the acquisition of a right

obtained from a Government agency," which depends, in turn, on "whether the respective fees were paid in the process of investigating or otherwise pursuing that transaction." (A28.)[5]  The parties agree (A29) that the right to market and sell a generic drug pursuant to an FDA-approved ANDA with a paragraph IV certification is a right obtained from a government agency that qualifies as an intangible. *See* Treas. Reg. § 1.263(a)-4(d)(5)(i).  And because a paragraph IV applicant does not acquire that right until the FDA's approval becomes effective, the Tax Court correctly concluded that the relevant "transaction"—*i.e.*, "the acquisition . . . of [the] intangible," Treas. Reg. § 1.263(a)-4(e)(1)(i)—is the acquisition of *effective* FDA approval of an ANDA with a paragraph IV certification.  (A29–30.)  As the court explained:

> [FDA] approval does not confer any rights on an applicant until it becomes "effective."  Only at that point does the right

---

[5] It might arguably be more accurate to describe the transaction in terms of "creation" rather than "acquisition," since the regulation refers to rights obtained from government agencies as being "created" rather than "acquired."  *See* Treas. Reg. § 1.263(a)-4(b)(1)(ii), (d)(1).  In this case, however, the distinction is immaterial because the requirement to capitalize facilitative expenses applies equally to both created and acquired intangibles.  *See* Treas. Reg. § 1.263(a)-4(b)(1)(v), (e)(1)(i).  For simplicity, we follow the Tax Court's convention of referring to Mylan's transactions in terms of "acquisition."

attach, which then allows for a generic drug to be
"introduced or delivered for introduction into interstate
commerce."

Mylan has not shown, and we have not found, any
authority demonstrating that approval before it becomes
effective confers rights equivalent to "rights under a
trademark, trade name, copyright, license, permit, franchise,
or other similar right granted by [a] governmental agency."

(A30 (quoting 21 C.F.R. § 314.107(a); Treas. Reg. § 1.263(a)-4(d)(5)(i);

and citing 21 U.S.C. § 355(a), (j)(5)(B).)

So with this understanding of the relevant intangible and

transaction, the dispositive issue becomes whether Mylan incurred the

legal fees at issue "in the process of investigating or otherwise

pursuing" effective FDA approvals of its paragraph IV ANDAs.  Treas.

Reg. § 1.263(a)-4(e)(1)(i).  Indeed, the Tax Court recognized as much

when it analyzed the legal fees that Mylan incurred to prepare the

required notice letters regarding its paragraph IV certifications.  (A31–

32.)  And Mylan did not cross-appeal the court's conclusion that those

notice-related fees were "incurred 'investigating or otherwise pursuing'

the transaction" and must therefore be capitalized.  (A32 (quoting

Treas. Reg. § 1.263(a)-4(e)(1)(i)).)  But as we explain below, the court

then lost sight of the issue when it turned to the fees that Mylan

incurred in defending against Section 271(e)(2) infringement suits, and as a result, the court failed to recognize that those litigation expenses were likewise incurred in the process of pursuing effective FDA approvals of Mylan's paragraph IV ANDAs.

### B.   Mylan's litigation expenses facilitated its acquisition of effective FDA approvals of its paragraph IV ANDAs because Mylan incurred them in the process of pursuing those transactions

Again, with certain exceptions not applicable here, "an amount is paid to facilitate the acquisition or creation of an intangible (the transaction) if the amount is paid in the process of investigating or otherwise pursuing the transaction." Treas. Reg. § 1.263(a)-4(e)(1)(i). Thus, any expense paid by a paragraph IV applicant "in the process of . . . pursuing" effective FDA approval is, *by definition*, "[a]n amount paid to facilitate . . . an acquisition or creation of an intangible," which the applicant "must capitalize." Treas. Reg. § 1.263(a)-4(b)(1), (b)(1)(v), (e)(1)(i); *see also id.* § 1.263(a)-4(b)(1)(ii), (d)(5). And contrary to the Tax Court's erroneous conclusion, any Section 271(e)(2) litigation expenses that a paragraph IV applicant incurs are—by Congressional design— necessarily incurred in the process of pursuing effective FDA approval.

### 1. Section 271(e)(2) litigation is part of the statutory process that Congress prescribed for pursuing FDA approval to market and sell a generic before the brand-name patents expire

The FDA-granted right (*i.e.*, the intangible) that paragraph IV applicants seek is not just the right to market and sell a generic drug, but the right to do so *before* the brand-name patents expire. Indeed, under the application and approval scheme that Congress established in the Hatch-Waxman Act, obtaining an FDA approval that is more valuable because it has a pre-expiration effective date is the only reason for a generic-drug applicant to ever proceed under paragraph IV in the first place. Unlike the post-expiration effective approval that is available by proceeding under paragraph III, the only way to obtain a generic-drug approval that is effective before the brand-name patents expire is to (1) commit an act of deemed infringement by making a paragraph IV certification, (2) notify the patent holders of that infringing certification, and then (3) contest any Section 271(e)(2) infringement suits that are brought in response. Thus, the process that Congress established for obtaining approval to market generic drugs before the brand-name patents expire makes inviting Section 271(e)(2)

infringement suits—and defending any that are brought—a prerequisite.

Accordingly, any Section 271(e)(2) litigation expenses incurred by a paragraph IV applicant are necessarily incurred "in the process of . . . pursuing" the acquisition of effective FDA approval—specifically, FDA approval with a pre-expiration effective date, which is the entire point of the paragraph IV process. Again, pre-expiration effectiveness is part of the intangible itself (*i.e.*, the agency-granted right) that a paragraph IV applicant seeks to acquire. And as a matter of law, that acquisition (*i.e.*, "the transaction") cannot occur unless the applicant incurs the expense of litigating any Section 271(e)(2) infringement suits that the patentholders bring against it.

That such litigation is not *always* necessary to obtain effective FDA approval of a paragraph IV ANDA—as when the patentholder declines to bring suit—is beside the point. The question is whether a paragraph IV applicant that *does* engage in Section 271(e)(2) litigation, as Mylan did here, does so as part of the statutory process for pursuing effective approval of its ANDA. And the answer to that question is clearly "yes."

Indeed, without the deemed infringement that results from the applicant's paragraph IV certification, the patentholders would have no cause of action under Section 271(e)(2) to begin with. And as the Tax Court acknowledged (A37), when patentholders do file suit in response to an applicant's paragraph IV certification, the Hatch-Waxman Act ties the effective date of the approval of the applicant's ANDA to the pendency and/or outcome of that Section 271(e)(2) litigation. *See* 21 U.S.C. § 355(j)(5)(B)(iii). Obtaining an effective date that is earlier than the patent-expiration date—which is the sole purpose of the paragraph IV process—requires the applicant to litigate any such suit until it has either been pending for 30 months or been resolved sooner without a finding of infringement.

Also "relevant," though not itself "determinative," is the fact that Mylan would not have incurred its litigation expenses "but for the transaction." Treas. Reg. § 1.263(a)-4(e)(1)(i). As the Tax Court acknowledged, "absent the transaction to obtain FDA approval, the generic drug manufacturer would not make a paragraph IV certification, the patent holder would not initiate a Section 271(e)(2) suit, and the generic drug manufacturer would not incur litigation

expenses defending that suit." (A40.)  Although the Tax Court disagreed that this establishes a "but for" relationship, it did so on the theory that even if Hatch-Waxman had never been enacted, a company seeking FDA approval of a generic drug prior to the relevant patent-expiration date would have had to defend against a conventional patent-infringement suit in lieu of a Section 271(e)(2) suit. (A40 & n.13.)

But the question is whether Mylan would have incurred patent-infringement litigation expenses "[e]ven absent *the transaction*" (A40 (emphasis added)), not whether Mylan would have incurred such expenses even if it had it sought the same result—FDA approval with a pre-expiration effective date—under prior law. The Tax Court correctly defined the transaction as the acquisition of "effective approval of an ANDA with a paragraph IV certification" (A29–30). And absent that transaction, there would be no infringement because the subject generic could not be marketed *before* the brand-name drug patents expire, and marketing the generic *after* the patents expire would not be infringing. So without the transaction, the patentholder would have no infringement claim on which to sue (since the Hatch-Waxman Act made

-34-

research and development of generics non-infringing as a matter of law, 35 U.S.C. § 271(e)(1)).  Thus, any expenses that a paragraph IV applicant incurs in defending against Section 271(e)(2) infringement suits would not be incurred but for the transaction.

In short, there is simply no denying that the expenses of defending against Section 271(e)(2) suits are incurred "in the process of . . . pursuing" effective FDA approval of an ANDA with a paragraph IV certification.  Treas. Reg. § 1.263(a)-4(e)(1)(i).  And since expenses incurred in the process of pursuing the acquisition of an intangible are, by definition, incurred to "facilitate" that transaction, *id.*, the plain language of the regulation compels the conclusion that Mylan was required to capitalize its Section 271(e)(2) litigation expenses, Treas. Reg. § 1.263(a)-4(b)(v).

> **2.    Section 271(e)(2) litigation expenses are incurred in the process of pursuing effective FDA approval of paragraph IV ANDAs whether or not such litigation is a "step" in the approval process**

The Tax Court did not squarely address whether Mylan incurred its Section 271(e)(2) litigation expenses in the process of pursuing effective FDA approvals of its paragraph IV ANDAs.  (*See* A32–41.) After initially recognizing that the dispositive issue is whether Mylan

-35-

incurred its legal fees "in the process of investigating or otherwise pursuing" (and, thus, to "facilitate") those transactions (A28–29, 32), the court lost sight of that issue when it turned to the fees that Mylan incurred in Section 271(e)(2) infringement litigation.  Instead, the court erroneously focused its analysis on a more abstract question: whether patent litigation is a "step" or "element" in the ANDA approval process. (A33–41.)

As a threshold matter, the Tax Court's conclusion that "Section 271(e)(2) litigation is not a step in obtaining effective FDA approval of an ANDA with a paragraph IV certification" is dubious at best.  Again, the only reason for an applicant to make a paragraph IV certification— and thereby expose itself to deemed-infringement suits—is to obtain an approval that is effective before patent expiration.  And Congress made defending any suits that *are* brought a further prerequisite to obtaining pre-expiration effectiveness.  Thus, when a paragraph IV applicant is sued under Section 271(e)(2), litigation of that suit seems clearly to be a "step" in obtaining effective approval.  The Tax Court's conclusion that expenses incurred in defending Section 271(e)(2) litigation are not "paid to facilitate" the transaction because such litigation "is not a step in

-36-

obtaining effective FDA approval of an ANDA with a paragraph IV

certification" (A41) therefore rests on a false premise.

Moreover, even if Section 271(e)(2) litigation were not a "step" in

the approval process, that is not the issue under the regulation. The

Tax Court cited (A32) a provision of the regulation that defines the term

"transaction" as "includ[ing] a series of *steps* carried out as part of a

single plan." Treas. Reg. § 1.263(a)-4(e)(3) (emphasis added). But the

purpose of that language is to prevent taxpayers from manipulating the

$5,000 de minimis rule of Treas. Reg. § 1.263(a)-4(e)(4)(iii) by claiming

that a multi-step transaction is actually multiple transactions over

which facilitative costs may be spread. *See* Treas. Reg. § 1.263(a)-

4(e)(3) (second and third sentences); § 1.263(a)-4(e)(5), Example 7. To

the extent the Tax Court derived its "step" requirement from § 1.263(a)-

4(e)(3), it erred in doing so.

Regardless of its origin, the Tax Court's "step" requirement

improperly narrows the regulatory definition of expenses that

"facilitate" a transaction, as "the process of investigating or otherwise

pursuing"—*i.e.*, "facilitat[ing]"—"the transaction" is necessarily broader

than the steps that comprise the transaction itself. Treas. Reg.

§ 1.263(a)-4(e)(1).  To read the regulation otherwise would render its definition of facilitative expenses meaningless.  The true facilitation issue is whether expenses incurred in defending Section 271(e)(2) litigation are paid in the process of *pursuing* the acquisition of effective approval of a paragraph IV ANDA, not whether such litigation may be considered a "step" in obtaining such approval.  Treas. Reg. § 1.263(a)-4(e)(1).  Because the Tax Court lost sight of that issue, its conclusion that Mylan's litigation expenses "were not 'paid to facilitate' the transaction" (A41) relied on factors that are not even relevant.

Indeed, it does not matter, as the Tax Court wrongly supposed (A37, 39), that patentholders are not *obligated* to sue paragraph IV applicants for infringement under Section 271(e)(2).  Under the plain language of the regulation, what matters is whether the litigation expenses that a paragraph IV applicant incurs when a patentholder *does* sue are incurred in the process of pursuing effective FDA approval.  And as we have shown, they clearly are.

Nor does it matter that "the outcome of a Section 271(e)(2) suit has no bearing on the FDA's safety and bioequivalence review"; that "the FDA 'shall approve' an ANDA unless it fails to satisfy certain

technical requirements"; that "[t]he FDA does not analyze patent issues as part of its review"; that "neither the statute nor the regulations suggest that patent issues might block approval of an ANDA"; and that, conversely, "winning a patent litigation suit does not ensure . . . approval, as the FDA can disapprove an ANDA for not meeting safety and bioequivalence standards." (A33–34 (quoting 21 U.S.C. § 355(j)(4)).) As the Tax Court recognized elsewhere in its opinion (A29–30), the issue is not just FDA approval of an ANDA, but *effective* FDA approval of a *paragraph IV* ANDA. And as a matter of law, no approval of a paragraph IV ANDA can become effective—regardless of the safety and bioequivalence review or any of the other above-cited considerations—until the applicant has made the paragraph IV certification and any timely Section 271(e)(2) suit brought in response has either been litigated for 30 months or been resolved sooner without a finding of infringement.

Also irrelevant are the Tax Court's observations that deemed-infringement suits under Section 271(e)(2) operate in fundamentally the same way as ordinary patent-infringement suits (A35–36, 37–38), and were created to protect patentholders (A38–39). Both give short shrift

-39-

to Congress's incorporation of Section 271(e)(2) suits into the ANDA process and miss the point that Congress did so in a way that made inviting and defending such suits a precondition to obtaining the special benefit that proceeding under paragraph IV affords. Although the Tax Court recognized that "[t]he statutory coordination between the outcome of Section 271(e)(2) litigation and FDA effective approval ensures that the FDA does not run afoul of a District Court's resolution of the intellectual property rights" (A38), it failed to appreciate that defending against the infringement claim is therefore part of the process of pursuing effective approval.

The bottom line is that paragraph IV applicants who incur Section 271(e)(2) litigation expenses, as Mylan did here, necessarily do so in the process of pursuing the acquisition of effective FDA approval. Consequently, such expenses are, by definition, incurred to facilitate the acquisition of an intangible. Treas. Reg. § 1.263(a)-4(e)(1). And as a result, they are not deductible as ordinary and necessary business expenses, but rather are capital expenditures that must be capitalized. Treas. Reg. § 1.263(a)-4(b)(1)(v).

### 3. The tax treatment of patent-litigation expenses incurred outside the context of acquiring an intangible is irrelevant

Under the plain language of the controlling regulation, the fact that Mylan incurred its litigation expenses in the process of pursuing—and thus, by definition, to facilitate—the acquisition of effective FDA approvals is conclusive of Mylan's obligation to capitalize those expenditures. *See* Treas. Reg. § 1.263(a)-4(b)(1)(v), (e)(1)(i). The Tax Court's reliance (A42–43) on this Court's decision in *Urquhart v. Commissioner*, 215 F.2d 17 (3d Cir. 1954)—and other cases in which patent-litigation expenses were held to be deductible—is misplaced because none of the cited authorities involved expenses incurred in the process of pursuing, or to otherwise facilitate, the acquisition of an intangible. As the court itself acknowledged earlier in its opinion, "An expenditure, no matter its type, may be deductible in one setting but nevertheless required to be capitalized in another." (A20–21 (citing *Lychuk v. Commissioner*, 116 T.C. 374, 388 (2001); *Am. Stores Co. & Subs. v. Commissioner*, 114 T.C. 458, 469 (2000).) In other words, "[s]imply because other cases have allowed a current deduction for

similar expenses in different contexts does not require the same result
here." *Am. Stores*, 114 T.C. at 469 (citing *Idaho Power*, 418 U.S. at 13).)

Applying that principle here demonstrates the flaw in the Tax
Court's reasoning because in none of the authorities that the court
invoked, including *Urquhart*, were the patent-litigation expenses at
issue incurred in the context of acquiring an intangible.  There is no
question, as those authorities demonstrate, that expenses incurred in
patent litigation are generally just costs of doing business and
deductible accordingly under I.R.C. § 162(a).  And that includes the
litigation expenses incurred not only by both parties to an ordinary
infringement suit, but also by *the patentholder* in a Section 271(e)(2)
infringement suit, because none of those litigants incurred the expenses
to acquire, create, or facilitate the acquisition or creation of an
intangible capital asset.

But that is not so in the case of *the paragraph IV applicant* in a
Section 271(e)(2) infringement suit.  Because the applicant litigates that
suit to facilitate its acquisition of an intangible asset, the applicant's
litigation expenses are capital expenditures and must therefore be
capitalized.  The decisions in *Urquhart* and the other cases cited by the

-42-

Tax Court are not to the contrary, as none of them involved litigation expenses incurred by a paragraph IV applicant in a Section 271(e)(2) suit or to otherwise facilitate the acquisition or creation of an intangible.

The Tax Court discussed *Urquhart* and similar cases in the context of the judicially created "origin of the claim" doctrine (*see* A41–45), which the Supreme Court first applied to a capitalization case in *Woodward v. Commissioner*, 397 U.S. 572 (1970). In the Tax Court's view, the doctrine "likewise indicates that Section 271(e)(2) litigation expenses should be treated as deductible ordinary and necessary business expenses." (A41.) But as the Tax Court appears to have recognized, the 2004 regulation is controlling, not the origin-of-the-claim test.[6]

---

[6] Although the controlling regulation post-dates the origin-of-the-claim test, that test appears to have at least informed the "facilitates" analysis prescribed by the regulations. *See* Treas. Reg. § 1.263(a)-4(e)(5), Example 4 (based on *Woodward*); Treas. Reg. § 1.263(a)-5(l), Example 10 (based on *American Stores*); 5 Bittker & Lokken, *Federal Taxation of Income, Estates & Gifts* ¶ 106.1.2, at 106–26 (3d ed. 2012) ("Although the . . . regulations do not use the language, 'origin of the claim,' . . . [t]he ["facilitates"] rule encompasses most, if not all, of the

(continued...)

-43-

And in any event, contrary to the Tax Court's conclusion, the origin-of-the-claim test confirms what the controlling regulation requires: Mylan's Section 271(e)(2) litigation expenses must be capitalized.  Indeed, just as the regulation asks whether the litigation expenses were paid "in the process of . . .pursuing" the acquisition of a capital asset, Treas. Reg. § 1.263(a)-4(e)(1)(i), the Tax Court recognized that the relevant inquiry under the origin-of-the-claim test is "'whether the origin of the claim litigated is in the process of acquisition' . . . of a capital asset."  (A41 (quoting *Woodward*, 397 U.S. at 577).)  But far more apposite than *Urquhart* and the other cases cited by the Tax Court in that regard (A42–43)—cases involving patent litigation, but not in the acquisition context—is *American Stores*, a case in which the court actually applied the origin-of-the-claim test.  114 T.C. at 470–73.

In *American Stores*, the Tax Court held that expenses incurred by a corporation to defend against antitrust litigation commenced in response to its acquisition of all of the outstanding stock of another corporation must be capitalized because "[t]he origin of the . . . antitrust

---

costs that courts have required to be capitalized under the origin-of-the-claim rubric.").

suit was American Stores' acquisition of Lucky Stores." 114 T.C. at 473.

Stressing the importance of the context in which expenditures are

incurred, the court explained that the taxpayer's reliance on cases

allegedly "support[ing] the proposition that expenses incurred in an

antitrust defense are always deductible [was] misplaced." *Id.* at 469.

The same is true of the Tax Court's reliance, in the case at bar, on cases

suggesting that patent litigation expenses are always deductible.

## C.     The regulatory examples support the Commissioner's position

The 2004 regulations include a number of examples illustrating

the scope of the term "facilitate" as used in Treas. Reg. §§ 1.263(a)-4

and 1.263(a)-5.[7]  Although none are directly on point, two of the

examples are apposite by analogy, and both support the conclusion that

Mylan incurred its litigation expenses to facilitate its acquisition of

effective FDA approvals.

_____

[7] Section 1.263(a)-5, issued simultaneously with § 1.263(a)-4,
applies to amounts paid to facilitate certain corporate acquisitions and
restructurings.  *See generally INDOPCO, Inc. v. Commissioner*, 503
U.S. 79 (1992).  The scope of the term "facilitate" as used in § 1.263(a)-5
is substantially identical to the scope of that term as used in § 1.263(a)-
4.  *Compare* Treas. Reg. § 1.263(a)-4(e)(1)(i) *with* Treas. Reg. § 1.263(a)-
5(b)(1) (first four sentences).

Example 4 of § 1.263(a)-4(e)(5) is based on the facts and holding of the *Woodward* case, which first articulated the general rule, later adopted in the regulations, that "[a]n amount paid to determine the value or price of an intangible is an amount paid in the process of investigating or otherwise pursuing the transaction." Treas. Reg. § 1.263(a)-4(e)(1)(i). The example involves a majority shareholder of a corporation who wishes to extend the corporation's charter indefinitely and is required by state law to buy out a dissenting minority shareholder, and who brings a state-court action to determine the buy-out price when the parties cannot agree. Treas. Reg. § 1.263(a)-4(e)(5) (Example 4). The example concludes that the expenses of litigating that suit are capital expenditures. *Id.*

Example 4 thus shares a key feature with the transaction here: the law effectively required the taxpayer (*i.e.*, the majority shareholder in the example and Mylan here) to litigate a particular proceeding as a prerequisite to obtaining the intangible it sought if its counterparty (*i.e.*, the dissenting minority shareholder in the example and the patentholders here) elected to contest the relevant issues. The Tax Court distinguished Example 4 on the ground that the expenses there

were incurred to establish a "necessary element of the transaction."

(A47.)  But that is not the rationale expressed in the example; rather,

the example states that the expenses must be capitalized because—as is

the case with the litigation expenses at issue here—they "facilitate[ ]

the acquisition of" an intangible asset.  Treas. Reg. § 1.263(a)-4(e)(5)

(Example 4); *see id.* § 1.263(a)-4(e)(1)(i).  In any event, as we have

shown, Mylan *did* incur Section 271(e)(2) litigation expenses to

establish a necessary element of the transactions here—*i.e.*, pre-

expiration effectiveness of the FDA approvals.  So even under the Tax

Court's "necessary element" approach, Section 271(e)(2) litigation

expenses are analogous to the litigation expenses that Example 4 deems

subject to capitalization.

Perhaps even more analogous are the litigation expenses in

Example 10 of § 1.263(a)-5(l), which concludes that expenses incurred

by a corporation to defend against antitrust litigation commenced in

response to its acquisition of all the outstanding stock of another

corporation must be capitalized as amounts incurred to facilitate that

acquisition.  Treas. Reg. § 1.263(a)-5(l) (Example 10) (based on

*American Stores*).  Here, the Tax Court ascribed great weight to the fact

-47-

that not every paragraph IV applicant has to defend against Section

271(e)(2) litigation in order to obtain FDA approval with a pre-

expiration effective date (because not every patentholder sues).  But not

every purchaser of a competing business has to defend against antitrust

litigation in order to consummate that acquisition.  So just as that fact

does not affect the analysis in Example 10, it should not affect the

analysis here.

The Tax Court found most compelling Example 18 of § 1.263(a)-

5(l), in which a taxpayer that is a defendant in multiple product-

liability suits files a Chapter 11 bankruptcy petition "in an effort to

manage all of the lawsuits in a single proceeding."  (A46 (quoting Treas.

Reg. § 1.263(a)-5(l) (Example 18(i))).)  The example concludes that

"amounts paid by [the taxpayer] to its outside counsel" in connection

with resolving the taxpayer's tort liability as part of a bankruptcy

reorganization "do not facilitate the reorganization and are not required

to be capitalized, provided that such amounts would have been treated

as ordinary and necessary business expenses" but for the bankruptcy.

Treas. Reg. § 1.263(a)-5(l) (Example 18(ii)).  The Tax Court failed to

appreciate, however, that Example 18 is not intended to be broadly

-48-

illustrative of the general "facilitates" rule, *see* Treas. Reg. § 1.263(a)-5(a), (b)(1), but rather illustrates a longstanding exception to a bankruptcy-specific rule.[8]  Treas. Reg. § 1.263(a)-5(c)(4); *see* Rev. Rul. 77-204, 1977-1 C.B. 40, 40.  It is therefore not analogous to non-bankruptcy contexts.  And even if it were, the terms on which the taxpayer in the example resolves its tort liabilities may have a practical bearing on the confirmability of its Chapter 11 plan, but that connection to the reorganization is, at best, much more attenuated than the link between Section 271(e)(2) infringement suits and the acquisition of effective FDA approval.  Example 18 does not support Mylan's position.

### D.     Requiring Mylan to capitalize its litigation expenses is consistent with the purpose of I.R.C. § 263

It bears repeating that this case concerns only *when*, not *whether*, Mylan can deduct its litigation expenses.  Mylan will no doubt argue that requiring it to capitalize those expenditures and deduct them

---

[8] The bankruptcy-specific rule was included in the regulation in response to comments "specifically request[ing] that the final regulations address the treatment of costs incurred in a Chapter 11 bankruptcy proceeding that is instituted in order to manage and resolve tort claims and distinguish these proceedings from other bankruptcy cases."  T.D. 9107, 2004-1 C.B. 447, 69 Fed. Reg. 436, 441 (Jan. 5, 2004).

-49-

ratably over the applicable amortization period is somehow an extreme

or extraordinary result, but that is not so.  Capitalization of Mylan's

litigation expenses is not only required by the plain language of the

regulation, but also is consistent with the policy behind the Internal

Revenue Code's requirement to capitalize *all* capital expenditures.

As the Supreme Court has explained, the purpose of I.R.C. § 263

and related provisions governing capitalization is "to match expenses

with the revenues of the taxable period to which they are properly

attributable, thereby resulting in a more accurate calculation of net

income for tax purposes."  *INDOPCO,* 503 U.S. at 84 (1992) (citing, *inter*

*alia, Idaho Power*, 418 U.S. at 16).  And requiring Mylan to capitalize

the litigation expenses it incurred to facilitate its acquisitions of

effective FDA approvals of its paragraph IV ANDAs—approvals that

entitle Mylan to market its generics for many years to come—does just

that.  The extreme position is Mylan's (and the Tax Court's) contention

that Mylan is entitled to fully deduct its litigation expenses years before

it will pay the taxes on the income that is attributable to those

expenses.  "[D]eductions are exceptions to the norm of capitalization,"

*id.*, and the Tax Court's conclusion that the "norm" does not apply to

Mylan's litigation expenses is contrary to both the regulation and the

underlying purpose of capitalization.

## CONCLUSION

The decisions of the Tax Court should be reversed and remanded

with instructions to enter decisions for the Commissioner in the

amounts determined in the notices of deficiency.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

s/ Clint A. Carpenter
ARTHUR T. CATTERALL  (202) 514-2937
CLINT A. CARPENTER    (202) 514-4346
  *D.C. Bar No. 991026*
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

MAY 18, 2022

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rule 28.3(d), it is hereby certified that, because the attorneys on this brief represent the Federal Government, the requirement that at least one attorney must be a member of the Bar of this Court is waived.

s/ Clint A. Carpenter
CLINT A. CARPENTER
   *Attorney for the Appellant*

# CERTIFICATE OF COMPLIANCE

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X]    this document contains 9,530 words, **or**

    [ ]    this brief uses a monospaced typeface and contains _____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]    this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

    [ ]    this brief has been prepared in a monospaced typeface using _____ with _____.

3.  The undersigned hereby further certifies that the foregoing brief filed electronically with the Court is in PDF searchable format, that the text of the PDF copy is identical to the text of the paper copy, that the PDF version has been electronically scanned for viruses with Microsoft Windows Defender (updated daily), and that, according to the program, no viruses were detected.

(s)   s/ Clint A. Carpenter_____

Attorney for  the Appellant_____

Dated:  May 18, 2022_____

# STATUTORY AND REGULATORY ADDENDUM

## Table of Contents

Hatch-Waxman Act:
    21 U.S.C. § 355 ................................................................. 53
    35 U.S.C. § 271 ................................................................. 59

Internal Revenue Code (26 U.S.C.):
    § 162 ................................................................................. 61
    § 263 ................................................................................. 61

Treasury Regulations (26 C.F.R.):
    § 1.263(a)-4 ...................................................................... 62
    § 1.263(a)-5 ...................................................................... 65

## 21 U.S.C.

## § 355. New drugs

\*    \*    \*    \*    \*

### (j) Abbreviated new drug applications

(1) Any person may file with the Secretary an abbreviated application for the approval of a new drug.

(2)

(A) An abbreviated application for a new drug shall contain—

(i) information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7)

(hereinafter in this subsection referred to as a "listed drug");

\*    \*    \*    \*    \*

(vii) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c)—

(I) that such patent information has not been filed,

(II) that such patent has expired,

(III) of the date on which such patent will expire, or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; \* \* \*

\*    \*    \*    \*    \*

(B) Notice of opinion that patent is invalid or will not be infringed.—

(i) Agreement to give notice.—

An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall include in the application a statement that the applicant will give notice as required by this subparagraph.

-55-

*      *      *      *      *

(iii) Recipients of notice.—

An applicant required under this subparagraph to give notice shall give notice to—

(I) each owner of the patent that is the subject of the certification (or a representative of the owner designated to receive such a notice); and

(II) the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent (or a representative of the holder designated to receive such a notice).

(iv) Contents of notice.—

A notice required under this subparagraph shall—

(I) state that an application that contains data from bioavailability or bioequivalence studies has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to in the certification; and

(II) include a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed.

-56-

\*    \*    \*    \*    \*

(5)

(A) Within one hundred and eighty days of the initial receipt of an application under paragraph (2) or within such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall approve or disapprove the application.

(B) The approval of an application submitted under paragraph (2) shall be made effective on the last applicable date determined by applying the following to each certification made under paragraph (2)(A)(vii):

(i) If the applicant only made a certification described in subclause (I) or (II) of paragraph (2)(A)(vii) or in both such subclauses, the approval may be made effective immediately.

(ii) If the applicant made a certification described in subclause (III) of paragraph (2)(A)(vii), the approval may be made effective on the date certified under subclause (III).

(iii) If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii), the approval shall be made effective immediately unless, before the expiration of 45 days after the date on which the notice described in paragraph (2)(B) is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under subsection (b)(1) or (c)(2) before the date on which the application (excluding an amendment or supplement to the application), which the Secretary later determines to

-57-

be substantially complete, was submitted. If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that—

(I) if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on—

(aa) the date on which the court enters judgment reflecting the decision; or

(bb) the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

(II) if before the expiration of such period the district court decides that the patent has been infringed—

(aa) if the judgment of the district court is appealed, the approval shall be made effective on—

(AA) the date on which the court of appeals decides that the patent is invalid or not infringed (including any

-58-

substantive determination that there is no cause of action for patent infringement or invalidity); or

(BB) the date of a settlement order or consent decree signed and entered by the court of appeals stating that the patent that is the subject of the certification is invalid or not infringed; or

(bb) if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of title 35;

(III) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective as provided in subclause (I); or

(IV) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent has been infringed, the approval shall be made effective as provided in subclause (II).

-59-

In such an action, each of the parties shall reasonably cooperate in expediting the action.

(iv) 180-day exclusivity period.—

(I) Effectiveness of application.—

Subject to subparagraph (D), if the application contains a certification described in paragraph (2)(A)(vii)(IV) and is for a drug for which a first applicant has submitted an application containing such a certification, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug (including the commercial marketing of the listed drug) by any first applicant.

\* \* \* \* \*

**35 U.S.C.**

## § 271. Infringement of patent

\* \* \* \* \*

**(e)**

(1) It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention \* \* \* solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

(2) It shall be an act of infringement to submit—

(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent,

\*     \*     \*     \*     \*

if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug, veterinary biological product, or biological product claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.

\*     \*     \*     \*     \*

(4) For an act of infringement described in paragraph (2)—

(A) the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed,

(B) injunctive relief may be granted against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug, veterinary biological product, or biological product,

(C) damages or other monetary relief may be awarded against an infringer only if there has been commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug, veterinary biological product, or biological product, and

\*     \*     \*     \*     \*

(5) Where a person has filed an application described in paragraph (2) that includes a certification under subsection (b)(2)(A)(iv) or (j)(2)(A)(vii)(IV) of section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355), and neither the owner of the patent that is the subject of the certification nor the holder of the approved application under subsection (b) of such section for the drug that is claimed by the patent or a use of which is claimed by the patent brought an action for infringement of such patent before the expiration of 45 days after the date on which the notice given under subsection (b)(3) or (j)(2)(B) of such section was received, the courts of the United States shall, to the extent consistent with the Constitution, have subject matter jurisdiction in any action brought by such person under section 2201 of title 28 for a declaratory judgment that such patent is invalid or not infringed.

\*     \*     \*     \*     \*

## Internal Revenue Code (26 U.S.C.)

## § 162. Trade or business expenses

### (a) In general

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

\*     \*     \*     \*     \*

## § 263. Capital expenditures

### (a) General rule

No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

\* \* \* \* \*

## Treasury Regulations (26 C.F.R.)

## § 1.263(a)-4. Amounts paid to acquire or create intangibles.

(a) *Overview.* This section provides rules for applying section 263(a) to amounts paid to acquire or create intangibles. * * * Paragraph (b) of this section provides a general principle of capitalization. Paragraphs (c) and (d) of this section identify intangibles for which capitalization is specifically required under the general principle. Paragraph (e) of this section provides rules for determining the extent to which taxpayers must capitalize transaction costs. * * *

(b) *Capitalization with respect to intangibles—*

(1) *In general.* Except as otherwise provided in this section, a taxpayer must capitalize—

(i) An amount paid to acquire an intangible (*see* paragraph (c) of this section);

(ii) An amount paid to create an intangible described in paragraph (d) of this section;

\* \* \* \* \*

(v) An amount paid to facilitate (within the meaning of paragraph (e)(1) of this section) an acquisition or creation of an intangible described in paragraph (b)(1)(i), (ii), (iii) or (iv) of this section.

\*     \*     \*     \*     \*

(4) *Coordination with other provisions of the Internal Revenue Code*—

(i) *In general.* Nothing in this section changes the treatment of an amount that is specifically provided for under any other provision of the Internal Revenue Code (other than section 162(a) or 212) or the regulations thereunder.

\*     \*     \*     \*     \*

(d) *Created intangibles*—

(1) *In general.* Except as provided in paragraph (f) of this section (relating to the 12-month rule), a taxpayer must capitalize amounts paid to create an intangible described in this paragraph (d). The determination of whether an amount is paid to create an intangible described in this paragraph (d) is to be made based on all of the facts and circumstances, disregarding distinctions between the labels used in this paragraph (d) to describe the intangible and the labels used by the taxpayer and other parties to the transaction.

\*     \*     \*     \*     \*

(5) *Certain rights obtained from a governmental agency*—

(i) *In general.* A taxpayer must capitalize amounts paid to a governmental agency to obtain, renew, renegotiate, or upgrade its rights under a trademark, trade name, copyright, license, permit, franchise, or other similar right granted by that governmental agency.

\*     \*     \*     \*     \*

-64-

(e) *Transaction costs*—

(1) *Scope of facilitate*—

(i) *In general.* Except as otherwise provided in this section, an amount is paid to facilitate the acquisition or creation of an intangible (the transaction) if the amount is paid in the process of investigating or otherwise pursuing the transaction. Whether an amount is paid in the process of investigating or otherwise pursuing the transaction is determined based on all of the facts and circumstances. In determining whether an amount is paid to facilitate a transaction, the fact that the amount would (or would not) have been paid but for the transaction is relevant, but is not determinative. An amount paid to determine the value or price of an intangible is an amount paid in the process of investigating or otherwise pursuing the transaction.

\*    \*    \*    \*    \*

(2) *Coordination with paragraph (d) of this section.* In the case of an amount paid to facilitate the creation of an intangible described in paragraph (d) of this section, the provisions of this paragraph (e) apply regardless of whether a payment described in paragraph (d) is made.

(3) *Transaction.* For purposes of this section, the term *transaction* means all of the factual elements comprising an acquisition or creation of an intangible and includes a series of steps carried out as part of a single plan. Thus, a transaction can involve more than one invoice and more than one intangible. For example, a purchase of intangibles under one purchase agreement constitutes a single transaction, notwithstanding the fact that the acquisition involves multiple intangibles and the amounts paid to facilitate the acquisition are capable of being allocated among the various intangibles acquired.

\*　　\*　　\*　　\*　　\*

(5) *Examples.* The following examples illustrate the rules of this paragraph (e):

\*　　\*　　\*　　\*　　\*

      *Example 4. Costs to facilitate.* U corporation, which owns a majority of the common stock of T corporation, votes its controlling interest in favor of a perpetual extension of T's charter. M, a minority shareholder in T, votes against the extension. Under applicable state law, U is required to purchase the stock of T held by M. When U and M are unable to agree on the value of M's shares, U brings an action in state court to appraise the value of M's stock interest. U pays attorney, accountant and appraisal fees of $25,000 for services rendered in connection with the negotiation and litigation with M. Because U's attorney, accountant and appraisal costs help establish the purchase price of M's stock, U's $25,000 payment facilitates the acquisition of stock. Accordingly, U must capitalize the $25,000 payment under paragraph (b)(1)(v) of this section.

## § 1.263(a)-5. Amounts paid or incurred to facilitate an acquisition of a trade or business, a change in the capital structure of a business entity, and certain other transactions.

\*　　\*　　\*　　\*　　\*

(l) *Examples.* The following examples illustrate the rules of this section:

\*　　\*　　\*　　\*　　\*

-66-

*Example 10. Corporate acquisition; antitrust defense costs.*
On March 1, 2005, V corporation enters into an agreement with X
corporation to acquire all of the outstanding stock of X. On April 1,
2005, federal and state regulators file suit against V to prevent
the acquisition of X on the ground that the acquisition violates
antitrust laws. V enters into a consent agreement with regulators
on May 1, 2005, that allows the acquisition to proceed, but
requires V to hold separate the business operations of X pending
the outcome of the antitrust suit and subjects V to possible
divestiture. V acquires title to all of the outstanding stock of X on
June 1, 2005. After June 1, 2005, the regulators pursue antitrust
litigation against V seeking rescission of the acquisition. V pays
$50,000 to its outside counsel for services rendered after June 1,
2005, to defend against the antitrust litigation. V ultimately
prevails in the antitrust litigation. V's costs to defend the
antitrust litigation are costs to facilitate its acquisition of the
stock of X under paragraph (a)(2) of this section and must be
capitalized. Although title to the shares of X passed to V prior to
the date V incurred costs to defend the antitrust litigation, the
amounts paid by V are paid in the process of pursuing the
acquisition of the stock of X because the acquisition was not
complete until the antitrust litigation was ultimately resolved. V
must capitalize the $50,000 in legal fees.

*        *        *        *        *

*Example 18. Bankruptcy reorganization.*

(i) X corporation is the defendant in numerous lawsuits
alleging tort liability based on X's role in manufacturing
certain defective products. X files a petition for
reorganization under Chapter 11 of the Bankruptcy Code in
an effort to manage all of the lawsuits in a single proceeding.
X pays its outside counsel to prepare the petition and plan of
reorganization, to analyze adequate protection under the

plan, to attend hearings before the Bankruptcy Court concerning the plan, and to defend against motions by creditors and tort claimants to strike the taxpayer's plan.

(ii) X's reorganization under Chapter 11 of the Bankruptcy Code is a reorganization within the meaning of paragraph (a)(4) of this section. Under paragraph (c)(4) of this section, amounts paid by X to its outside counsel to prepare, analyze or obtain approval of the portion of X's plan of reorganization that resolves X's tort liability do not facilitate the reorganization and are not required to be capitalized, provided that such amounts would have been treated as ordinary and necessary business expenses under section 162 had the bankruptcy proceeding not been instituted. All other amounts paid by X to its outside counsel for the services described above (including all amounts paid to prepare the bankruptcy petition) facilitate the reorganization and must be capitalized.

\*       \*       \*       \*       \*

# Nos. 22-1193, 22-1194, 22-1195

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

MYLAN INC. & SUBSIDIARIES,

Petitioner-Appellee

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellant

———————————

ON APPEAL FROM THE DECISIONS OF
THE UNITED STATES TAX COURT

———————————

APPENDIX

VOLUME I OF II (pages A1–A68)

———————————

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

ARTHUR T. CATTERALL  (202) 514-2937
CLINT A. CARPENTER    (202) 514-4346
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

# TABLE OF CONTENTS

**Document**                                               **Page**

## Volume I

T.C. Opinion (Judge Urda); 156 T.C. No. 10 (Apr. 27, 2021).................. A1

Stipulated Decision, No. 26976-16 (Nov. 2, 2021)................................ A50

Stipulated Decision, No. 26977-16 (Nov. 2, 2021)................................ A52

Stipulated Decision, No. 26978-16 (Nov. 2, 2021)................................ A54

Notice of Appeal to 3rd Circuit, No. 26976-16 (Jan. 28, 2022)............ A56

Notice of Appeal to 3rd Circuit, No. 26977-16 (Jan. 28, 2022)............ A61

Notice of Appeal to 3rd Circuit, No. 26978-16 (Jan. 28, 2022)............ A65

## Volume II

Docket entries, No. 26976-16 .................................................................. A69

Docket entries, No. 26977-16 .................................................................. A87

Docket entries, No. 26978-16 ............................................................... A105

156 T.C. No. 10

UNITED STATES TAX COURT

MYLAN, INC. & SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 26976-16, 26977-16,           Filed April 27, 2021.
        26978-16.

        P, a U.S. corporation, is a manufacturer of brand name and
generic pharmaceutical drugs.  During 2012 to 2014 P incurred legal
fees in connection with applications submitted to the Food & Drug
Administration (FDA) for approval to market and sell generic
versions of brand name drugs.  As part of the application process P
was required to provide a certification regarding the status of any
patents that had been listed by the FDA as covering the respective
brand name drug.  On some applications P certified that listed patents
covering the brand name drugs were invalid or would not be infringed
by the manufacture of P's generic drugs.  When it made such a
certification, P was required to send notice letters to the brand name
drug manufacturer and any patentees stating that P had made such a
certification.  Certification also constituted an act of patent
infringement giving the brand name manufacturer and patentees the
right to bring a patent infringement suit against P.  At issue are the
legal expenses incurred to prepare notice letters and legal expenses
incurred in defending against these patent infringement suits.

- 2 -

On its 2012, 2013, and 2014 returns, P deducted its legal expenses as ordinary and necessary business expenditures.  Upon examination, R determined that these expenses were nondeductible capital expenditures required to be capitalized and subsequently disallowed P's claimed deductions for the expenses at issue.  R thereafter issued a notice of deficiency for each of P's 2012, 2013, and 2014 taxable years determining deficiencies of $16,430,947, $12,618,695, and $20,988,657, respectively.

Held:  The legal expenses P incurred to prepare notice letters are required to be capitalized because they were necessary to obtain FDA approval of P's generic drugs.

Held, further, the legal expenses P incurred to defend patent infringement suits are deductible as ordinary and necessary business expenses because the patent litigation was distinct from the FDA approval process.

William F. Nelson and James G. Steele III, for petitioner.

Emily J. Giometti, Lisa M. Rodriguez, Mary Helen Weber, Kathryn E. Kelly, and Nina P. Ching, for respondent.

URDA, Judge:  Petitioner, Mylan, Inc. & Subsidiaries (Mylan), is a manufacturer of brand name and generic pharmaceutical drugs.  From 2012 through 2014 it incurred significant legal expenses in preparing notice letters and defending patent infringement lawsuits related to its generic versions of certain brand name drugs.  On its 2012 through 2014 Federal income tax returns, Mylan

- 3 -

claimed deductions for the legal fees as ordinary and necessary business expenses under section 162(a).[1]  The Internal Revenue Service (IRS) subsequently disallowed these deductions, determining that the legal expenses were required to be capitalized pursuant to section 263(a).  We conclude that the legal expenses Mylan incurred to prepare notice letters are required to be capitalized, while the litigation expenses Mylan incurred to defend patent infringement suits are deductible as ordinary and necessary business expenses.

## Introduction

We begin by describing the highly reticulated statutory and regulatory scheme under which Mylan's legal expenses were incurred.  Before a pharmaceutical company can market or sell a brand name or generic drug in the United States, it must first obtain approval from the Food & Drug Administration (FDA), the Federal agency responsible for, inter alia, the safety and efficacy of pharmaceuticals.  <u>See</u> Federal Food, Drug, and Cosmetic Act, ch. 675, sec. 505, 52 Stat. at 1052 (1938) (codified as amended at 21 U.S.C. sec. 355 (2012)).  Although the first step in requesting approval is the same for both brand name and generic

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.), as amended, in effect for the years at issue. Rule references are to the Tax Court Rules of Practice and Procedure.  All amounts are rounded to the nearest dollar.

- 4 -

drugs, i.e., by submitting to the FDA a Form FDA 356h, Application To Market a

New or Abbreviated New Drug or Biologic for Human Use, the roads diverge

thereafter.

A.    Brand Name Pharmaceuticals

    1.    New Drug Application

For brand name pharmaceuticals, a drug's manufacturer formally proposes

that the FDA approve the new drug for sale and marketing in the United States

through a new drug application (NDA).  See, e.g., FTC v. Actavis, Inc., 570 U.S.

136, 142 (2013).  The NDA must provide sufficient information for the FDA to

review the drug's components, methods of manufacturing and testing, proposed

uses and labeling, and results of clinical trials demonstrating that it is safe and

effective.  21 U.S.C. sec. 355(b).  The drug manufacturer then undergoes a "long,

comprehensive, and costly testing process, after which, if successful, the

manufacturer will receive marketing approval from the FDA."  Actavis, 570 U.S.

at 142; see also 21 U.S.C. sec. 355(d).

    2.    The Orange Book

NDA holders are required to submit patent information for patents that

cover an FDA-approved brand name drug or an approved method of using that

drug.  See 21 U.S.C. sec. 355(b)(1), (c)(2); see also aaiPharma Inc. v. Thompson,

- 5 -

296 F.3d 227, 230 (4th Cir. 2002).  Patents so disclosed are listed in a register

maintained by the FDA, the Approved Drug Products with Therapeutic

Equivalence Evaluations (Orange Book).  See Caraco Pharm. Labs., Ltd. v. Novo

Nordisk A/S, 566 U.S. 399, 405-406 (2012); aaiPharma, 296 F.3d at 231.  The

FDA does not confirm the accuracy of the information provided with the Patent &

Trademark Office or the NDA applicant.  See Am. Bioscience, Inc. v. Thompson,

269 F.3d 1077, 1080 (D.C. Cir. 2001); see also Caraco, 566 U.S. at 406-407;

Apotex, Inc. v. Thompson, 347 F.3d 1335, 1349 (Fed. Cir. 2003).

B.    Generic Pharmaceuticals

    1.    Hatch-Waxman Act

Until 1984, manufacturers of generic pharmaceuticals, like their brand name

counterparts, were required to submit an NDA for FDA approval.  See aaiPharma,

296 F.3d at 230-231.  Congress altered course, however, in the Drug Price

Competition and Patent Term Restoration Act of 1984 (Hatch-Waxman Act or

Act), Pub. L. No. 98-417, 98 Stat. 1585.  In the Act Congress sought "to strike a

balance between 'two conflicting policy objectives:  to induce name-brand

pharmaceutical firms to make the investments necessary to research and develop

new drug products, while simultaneously enabling competitors to bring cheaper,

generic copies of those drugs to market.'"  aaiPharma, 296 F.3d at 230 (quoting

- 6 -

Abbott Labs. v. Young, 920 F.2d 984, 991 (D.C. Cir. 1990) (Edwards, J.,

dissenting on other grounds)); see also Eli Lilly & Co. v. Medtronic, Inc., 496 U.S.

661, 676 (1990); In re Lipitor Antitrust Litig., 868 F.3d 231, 240 (3d Cir. 2017).

    2.    Abbreviated NDA

    a.    FDA Submission

To implement the congressional purpose of bringing cheaper generic drugs

to market, the Hatch-Waxman Act established a shortcut to FDA approval for

manufacturers hoping to develop and market generic copies of brand name drugs

previously approved by the FDA.  See Actavis, 570 U.S. at 142; In re Lipitor, 868

F.3d at 240.  Under this expedited approach, a generic drug manufacturer may

submit an abbreviated new drug application (ANDA) that piggybacks on an

approved brand name drug's NDA information by specifying that the generic has

the "same active ingredients as, and is biologically equivalent to," the

already-approved brand name drug.  Caraco, 566 U.S. at 404-405 (citing 21 U.S.C.

sec. 355(j)(2)(A)(ii), (iv)); see also Actavis, 570 U.S. at 142.  Because the FDA

would have previously determined the brand name drug to be safe and effective,

the ANDA applicant can obtain approval while avoiding the "costly and

time-consuming studies" needed to obtain approval for a brand name drug.  See

Eli Lilly, 496 U.S. at 676.

- 7 -

b.  <u>Approval</u>

The "FDA will approve an * * * [ANDA] and send the applicant an

approval letter if none of the reasons in § 314.127 for refusing to approve the * * *

[ANDA] applies."  21 C.F.R. sec. 314.105(d) (2014); <u>see also</u> 21 U.S.C. sec.

355(j)(4).  Title 21 C.F.R. sec. 314.127 (2014), in turn, enumerates a number of

technical reasons for the rejection of an ANDA including failure to show that the

generic has the same active ingredients as the brand name drug, failure to show

bioequivalence between the drugs, failure to establish that the production methods

would preserve the generic's identity, strength, quality, and purity, and failure to

show proper labeling.  <u>See also</u> 21 U.S.C. sec. 355(j)(4).  None of the listed

grounds relates to patent issues.  <u>See id.</u>; 21 C.F.R. sec. 314.127.

FDA approval of an ANDA, however, does not necessarily mean that a

generic drug may be sold and marketed.  A generic drug, rather, "may be

introduced * * * into interstate commerce when approval of the * * * [ANDA] for

the drug product becomes effective."  21 C.F.R. sec. 314.107(a) (2014); <u>see also</u>

21 U.S.C. sec. 355(a) ("No person shall introduce or deliver for introduction into

interstate commerce any new drug, unless an approval of an application filed

pursuant to subsection (b) or (j) of this section is effective with respect to such

drug.").  As a general matter, the "approval shall be made effective immediately".

- 8 -

21 U.S.C. sec. 355(j)(5)(B)(iii).  In certain instances approval comes with a

delayed effective date.  Such an approval is tentative and does not become final

until the effective date, id. cl. (iv)(II)(dd)(BB), which means that a new drug

product may not be introduced or delivered for introduction into interstate

commerce until approval of the ANDA is effective, id. subsec. (a).

3.    Patent Protections

In addition to endorsing a more simplified process for bringing generics to

market, the Hatch-Waxman Act "contains a complex set of provisions designed to

protect the intellectual property rights of * * * [brand name] drug companies and

others holding patents on brand name drugs."  aaiPharma, 296 F.3d at 231.

a.    Patent Litigation

The Hatch-Waxman Act created "special procedures" for identifying and

resolving patent disputes.  See Actavis, 570 U.S. at 143; In re Lipitor, 868 F.3d

at 240; see also Apotex, 347 F.3d at 1338 ("The Act also sought to facilitate the

resolution of patent-related disputes over pharmaceutical drugs by creating a

streamlined mechanism for identifying and resolving patent issues related to the

proposed generic products.").  When filing an ANDA, a generic drug

manufacturer must make one of four "certifications" with respect to each drug for

which there is a patent listed in the Orange Book.  21 U.S.C. sec. 355(j)(2)(A)(vii).

**A8**

- 9 -

Most relevant to these cases, a generic drug manufacturer may certify that any patent "is invalid or will not be infringed by the manufacture, use, or sale" of the generic version (paragraph IV certification). <u>Id.</u> subcl. (IV); <u>see also</u> <u>Actavis</u>, 570 U.S. at 143.

A paragraph IV certification "automatically counts as patent infringement, see 35 U.S.C. § 271(e)(2)(A) (2006 ed., Supp. V), and often 'means provoking litigation'". <u>Actavis</u>, 570 U.S. at 143 (quoting <u>Caraco</u>, 566 U.S. at 407); <u>see also</u> <u>Purepac Pharm. Co. v. Thompson</u>, 354 F.3d 877, 879 (D.C. Cir. 2004) ("In essence, applicants use paragraph IV certifications to challenge the validity of brand-name manufacturers' patents."); <u>Apotex</u>, 347 F.3d at 1339.  An ANDA applicant making a paragraph IV certification is required to notify the patentees and holder of the approved NDA implicated by its certification that it has made such certification within 20 days of the ANDA's filing.  <u>See</u> 21 U.S.C. sec. 355(j)(2)(B)(ii) and (iii).  This notification letter, inter alia, must include a detailed statement laying out the factual and legal bases for the applicant's conclusion that the patent is invalid or not infringed.  <u>See id.</u> cl. (iv).

The patentees and the NDA holder are entitled to bring suit in Federal District Court, with remedies including a court order that "the effective date of any approval of the drug * * * is not earlier than the date of the expiration of the patent

- 10 -

which has been infringed" and injunctive relief precluding the ANDA applicant

from commercial manufacture.  35 U.S.C. sec. 271(e)(2)(A), (4)(A) (2012); <u>see</u>

<u>also</u> 28 U.S.C. sec. 1338(a) (2012) (providing that the Federal District Courts have

original jurisdiction over "any civil action arising under any Act of Congress

relating to patents").  "Notwithstanding th[e] defined act of infringement, a district

court's inquiry in a suit brought under [35 U.S.C.] § 271(e)(2) is the same as it is

in any other infringement suit, <u>viz.</u>, whether the patent in question is 'invalid or

<u>will not be infringed</u> by the manufacture, use, or sale of the drug for which the

* * * [ANDA] is submitted.'"  <u>Glaxo, Inc. v. Novopharm, Ltd.</u>, 110 F.3d 1562,

1569 (Fed. Cir. 1997) (quoting 21 U.S.C. sec. 355(j)(2)(A)(vii)(IV)).  "The only

difference in actions brought under [35 U.S.C.] § 271(e)(2) is that the allegedly

infringing drug has not yet been marketed and therefore the question of

infringement must focus on what the ANDA applicant will likely market if its

application is approved, an act that has not yet occurred."  <u>Id.</u>

     b.   <u>Effective FDA Approval</u>

The date on which a 35 U.S.C. sec. 271(e)(2) (Section 271(e)(2)) suit is

initiated has consequences for the approval of the generic drug becoming

effective.  If a suit is brought within 45 days of notice of an ANDA with a

paragraph IV certification, it triggers a 30-month stay during which the FDA is

- 11 -

prohibited from granting "effective" approval to the ANDA while the parties litigate patent validity or infringement.  See 21 U.S.C. sec. 355(j)(5)(B)(iii); Actavis, 570 U.S. at 143.[2]

If the FDA approves the ANDA during the 30-month stay period, it will issue a "tentative approval letter".  21 C.F.R. sec. 314.107(b)(3)(v).  "In order for an approval to be made effective * * *, the applicant must receive an approval letter from the agency indicating that the application has received final approval."  Id.  "Tentative approval of an application does not constitute 'approval' of an application and cannot, absent a final approval letter from the agency, result in an effective approval under paragraph (b)(3) of this section."  Id.

"If the courts decide the matter * * * [during the 30-month stay] period, the FDA follows that determination; if they do not, the FDA may go forward and give [effective] approval to market the generic product."  Actavis, 570 U.S. at 143; see also 21 U.S.C. sec. 355(j)(5)(B)(iii) (explaining that approval "shall be made effective upon the expiration of the thirty-month period" absent court action).[3]

---

[2]Although a patent suit may be brought outside the 45-day window, the filing of such a suit does not prohibit the FDA from making its approval effective.

[3]Thus, if the court concludes that the patent was invalid or not infringed, FDA approval becomes effective on the same date as entry of the judgment.  See 21 U.S.C. sec. 355(j)(5)(B)(iii)(I) (2012); see also 21 C.F.R. sec. 314.107(b)(3)(ii)
(continued...)

**A11**

- 12 -

"The generic manufacturer then has the option to launch 'at risk,' meaning that, if

the ongoing court proceeding ultimately determines that the patent was valid and

infringed, the generic manufacturer will be liable for the brand-name

manufacturer's lost profits despite the FDA's approval." In re Lipitor, 868 F.3d

at 241.

c.    180-Day Exclusivity Period

Once approval of an ANDA becomes effective, the generic drug

manufacturer may begin commercially marketing the drug. See 21 U.S.C.

sec. 355(a); see also Eli Lilly, 496 U.S. at 677. "In order to encourage

paragraph IV challenges, thereby increasing the availability of low-cost generic

drugs, * * * [21 U.S.C. sec. 355(j)(5)(B)(iv)] provides that the first company to

win FDA approval of an ANDA containing a paragraph IV certification has the

right to sell its drug without competition for 180 days." Purepac, 354 F.3d at 879;

see also Teva Pharms., USA, Inc. v. Leavitt, 548 F.3d 103, 104-105 (D.C. Cir.

2008). "Marketing exclusivity is valuable, designed to compensate manufacturers

for research and development costs as well as the risk of litigation from patent

---

[3](...continued)
(2014). If the court concludes that there has been infringement, effective FDA
approval waits for patent expiration. See 21 U.S.C. sec. 355(j)(5)(B)(iii)(II); see
also 21 C.F.R. sec. 314.107(b)(3)(iii).

- 13 -

holders." Teva Pharms., USA, Inc., 548 F.3d at 104; see also Actavis, 570 U.S. at

144 ("Indeed, the Generic Pharmaceutical Association said * * * that the 'vast

majority of potential profits for a generic drug manufacturer materialize during the

180-day exclusivity period.'"); In re Lipitor, 868 F.3d at 241.

FINDINGS OF FACT

Mylan is a group of affiliated corporations that join in the filing of

consolidated Federal income tax returns. Mylan, Inc., a Pennsylvania corporation

and the common parent of that group, maintained its principal place of business in

Canonsburg, Pennsylvania, when it timely filed the petitions in these consolidated

cases.

I.    Mylan's Legal Expenses

Mylan manufactures both brand name and generic pharmaceuticals. During

the years relevant to these cases, Mylan regularly submitted ANDAs to obtain

FDA approval for generic versions of brand name drugs, including Celebrex,

Lunesta, and Nexium. As necessary to win FDA approval, Mylan set forth

detailed information to establish that the generic drug was bioequivalent to the

brand name drug, that the generic drug shared the same active components, and

that the manufacturing process would preserve the generic drug's identity,

strength, and purity.

- 14 -

Each ANDA also included a certification as to any patent listed in the
Orange Book as covering the brand name drug.  During the years relevant to these
cases, Mylan regularly included paragraph IV certifications, asserting that one or
more patents covering the respective brand name drug were invalid or would not
be infringed by Mylan's generic version.  Although Mylan understood that
paragraph IV certifications often resulted in litigation, it further recognized that
such certifications offered both the earliest opportunity to bring its generic
versions to market and the possibility (in some cases) of first-to-file exclusivity.

After filing ANDAs with paragraph IV certifications, Mylan prepared and
sent formal notice letters to the brand name drug manufacturers and patentees
implicated by the certifications.  The letters set forth in detail Mylan's
explanations as to the invalidity of the patents at issue or the reasons that the
manufacture, use, or sale of its generic version did not infringe such patents.
Mylan also informed the FDA when it sent these notice letters.

During 2012 through 2014, Mylan regularly defended itself against
Section 271(e)(2) suits brought in response to ANDAs with paragraph IV
certifications.  The FDA was not a party to these suits.  Mylan did notify the FDA
if a lawsuit was brought within 45 days of the issuance of the notice letter, in

- 15 -

consideration of the automatic 30-month stay mandated by 21 U.S.C.

sec. 355(j)(5)(B)(iii).

The FDA's scientific and regulatory review of Mylan's ANDAs with

paragraph IV certifications proceeded without regard to any Section 271(e)(2)

litigation.  In some instances during the years at issue the 30-month stay expired

during the pendency of the litigation, and Mylan obtained FDA approval for the

generic drug at issue before the suit's conclusion.  When that occurred, Mylan

would continue defending the Section 271(e)(2) suit.  On two occasions during the

relevant years, Mylan elected to launch an approved generic drug "at risk", i.e.,

after the expiration of the 30-month stay but before the resolution of the litigation.

When Mylan won or lost a Section 271(e)(2) suit during the years at issue, it

notified the FDA and provided a copy of the final judgment or mandate.  If Mylan

won, it was entitled to launch the generic drug at issue immediately upon approval

by the FDA without waiting for the expiration of the patents covering the brand

name drug.  If Mylan lost, the FDA would deem Mylan to have converted its

paragraph IV certification (that the patents listed in the Orange Book were invalid

or were not infringed) into a paragraph III certification (that approval was sought

for a period beginning after the expiration of such patents).  If Mylan lost the suit

- 16 -

after the ANDA had been approved, the FDA would convert the approval to a tentative approval effective after the expiration of the relevant patents.

Mylan also informed the FDA of other court action during the years at issue. Mylan apprised the FDA when it entered into settlements to resolve Section 271(e)(2) suits, communicating the terms of the settlement agreement including any license permitting Mylan to begin selling its generic drug before the expiration of the patents covering the brand name drug.  And Mylan informed the FDA when the court issued or vacated preliminary injunctions prohibiting the marketing or sale of its generic drugs before patent expiration.

Mylan incurred legal fees of $46,158,403, $38,211,911, and $38,618,993 during 2012, 2013, and 2014, respectively, to prepare notice letters and to litigate the Section 271(e)(2) suits.  During the years at issue Mylan reported legal expenses with respect to approximately 120 suits involving ANDAs with paragraph IV certifications and 15 additional ANDAs with paragraph IV certifications for which suits had not yet been filed.

II.    IRS Examination and Tax Court Proceedings

Mylan timely filed a consolidated Form 1120, U.S. Corporation Income Tax Return, for each of its 2012, 2013, and 2014 taxable years.  On those returns Mylan deducted $46,991,172, $39,684,483, and $44,060,180, respectively, for

- 17 -

legal fees and expenses it broadly attributed to the litigation of Section 271(e)(2) suits during those years.

Mylan's deductions for the years at issue broke down into the following expense categories:  (1) the legal fees described above that Mylan incurred to prepare paragraph IV notice letters and defend Section 271(e)(2) suits during 2012 through 2014; (2) legal fees of $832,769, $1,472,572, and $3,669,397, respectively, which Mylan incurred with respect to generic drugs (a) for which no Section 271(e)(2) suit was ever brought, (b) for which Section 271(e)(2) suits were brought but disposed of before the respective year for which the fees were claimed, and (c) for which Section 271(e)(2) suits were brought (or joined by Mylan) following the respective year for which the fees were claimed; and (3) legal fees of $1,771,790 which Mylan incurred in 2014 with respect to drugs that had already been approved by the FDA and commercially launched.

The IRS examined Mylan's 2012 through 2014 returns and determined that, with the exception of the third category of expense (i.e., the amounts incurred for previously approved and launched copies), all of the foregoing legal expenses were nondeductible capital expenditures required to be capitalized under

- 18 -

section 263(a) and subject to amortization under section 197.  It consequently

disallowed Mylan's claimed deductions, save for the $1,771,790 claimed for 2014.

The IRS thereafter issued notices of deficiency for each of Mylan's 2012,

2013, and 2014 taxable years determining deficiencies of $16,430,947,

$12,618,695, and $20,988,657, respectively.  Mylan filed timely petitions with this

Court for redetermination of the IRS' determinations for its 2012 through 2014

taxable years.  We consolidated the cases, and a trial was held in Washington,

D.C.  At trial Mylan put on fact witnesses, and both parties presented expert

testimony regarding internal FDA processes writ large and, more specifically, the

typical course of dealing between an ANDA applicant and the FDA during the

submission process for an ANDA with a paragraph IV certification.[4]

## OPINION

The Commissioner's determinations in a notice of deficiency are presumed

correct, and the taxpayer bears the burden of proving them erroneous.

Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  "In exploring the

relationship between deductions and capital expenditures," we are mindful of the

---

[4]A total of six expert witnesses testified at trial, with each party offering
three experts.  The Court admitted all the expert witness reports offered, including
the rebuttal reports.  Although the expert witnesses testified extensively at trial,
their testimony is not necessary for the purposes of deciding these cases.

**A18**

- 19 -

"familiar rule * * * that the burden of clearly showing the right to the claimed

deduction is on the taxpayer."  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84

(1992) (quoting Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593

(1943)).

I.     Deductibility Versus Capitalization

    A.     General Principles

Section 162(a) allows a deduction for "all the ordinary and necessary

expenses paid or incurred during the taxable year in carrying on any trade or

business".[5]  By contrast, section 263(a) provides that "[n]o deduction shall be

allowed" for a capital expenditure.  Deductions are exceptions to the "norm" of

capitalization.  See INDOPCO, Inc. v. Commissioner, 503 U.S. at 84.  Where

section 162 and section 263 each apply to a given expenditure, the capitalization

requirement controls and functions to bar the deduction.  See sec. 161; see also

Commissioner v. Idaho Power Co., 418 U.S. 1, 17-18 (1974).

The "primary effect" of a payment's classification as a deductible business

expense or nondeductible capital expenditure is seen in the timing of the

---

[5]An expense is "ordinary" if it is customary or usual within a particular trade, business, or industry or relates to a common or frequent transaction in the type of business involved.  See Deputy v. du Pont, 308 U.S. 488, 495 (1940).  An expense is "necessary" if it is appropriate and helpful to the operation of the taxpayer's business.  See Commissioner v. Tellier, 383 U.S. 687, 689 (1966).

- 20 -

taxpayer's cost recovery.  INDOPCO, Inc. v. Commissioner, 503 U.S. at 83.

Whereas a deduction for an ordinary and necessary business expenditure may be

taken in the current year and yields an immediate corresponding reduction in

taxable income, a capital expenditure typically results in recovery of a taxpayer's

expenditure over a longer period through amortization and depreciation

deductions.  See Ill. Tool Works, Inc. v. Commissioner, 355 F.3d 997, 1000 (7th

Cir. 2004), aff'g 117 T.C. 39 (2001); PNC Bancorp, Inc. v. Commissioner, 212

F.3d 822, 827 (3d Cir. 2000) (citing INDOPCO, Inc. v. Commissioner, 503 U.S.

at 83-84), rev'g 110 T.C. 349 (1998).  Section 263(a) thus "prevent[s] a taxpayer

from utilizing currently a deduction properly attributable, through amortization, to

later tax years when the capital asset becomes income producing."  Commissioner

v. Idaho Power Co., 418 U.S. at 16.

Whether a given expenditure is deductible under section 162 or must instead

be capitalized under section 263(a) turns on the particular facts of each case.  See

INDOPCO, Inc. v. Commissioner, 503 U.S. at 86; see also Santa Fe Pac. Gold Co.

& Subs. v. Commissioner, 132 T.C. 240, 262 (2009); FMR Corp. & Subs. v.

Commissioner, 110 T.C. 402, 415 (1998); Norwest Corp. & Subs. v.

Commissioner, 108 T.C. 265, 280 (1997).  An expenditure, no matter its type, may

be deductible in one setting but nevertheless required to be capitalized in another.

**A20**

- 21 -

See Lychuk v. Commissioner, 116 T.C. 374, 388 (2001); see also Am. Stores Co.

& Subs. v. Commissioner, 114 T.C. 458, 469 (2000) ("Simply because other cases

have allowed a current deduction for similar expenses in different contexts does

not require the same result * * * [in another case].").

B.    Capitalization of Intangibles

An expenditure generally must be capitalized where it is determined that the

expenditure either:  (1) creates or enhances a separate and distinct asset, or

(2) otherwise generates significant benefits for the taxpayer extending beyond the

current taxable year.  Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 262;

see also INDOPCO, Inc. v. Commissioner, 503 U.S. at 87; Lincoln Sav. & Loan

Ass'n v. Commissioner, 403 U.S. 345, 354 (1971).  In response to difficulties in

administering the significant future benefits standard in the context of intangible

assets, the IRS and the Department of the Treasury proposed regulations that

"defined the exclusive scope of the significant future benefit test through the

specific categories of intangible assets for which capitalization is required".  67

Fed. Reg. 77702 (Dec. 19, 2002).  As adopted, section 1.263(a)-4(b)(1), Income

Tax Regs., requires the capitalization of amounts paid, inter alia:  (1) to acquire an

existing intangible; (2) to create certain types of intangibles identified in section

1.263(a)-4(d), Income Tax Regs.; (3) to create or enhance various "separate and

- 22 -

distinct" intangibles; and (4) to create or enhance a "future benefit" identified in

subsequent guidance published by the IRS.

1.    Relevant Intangibles

For its part, section 1.263(a)-4(d)(5), (7), and (9), Income Tax Regs.,

enumerates certain "created intangibles", including "rights obtained from a

governmental agency", contract termination fees, and amounts paid to another to

defend or perfect title to intangible property.[6]  With respect to rights obtained from

a governmental agency, section 1.263(a)-4(d)(5)(I), Income Tax Regs., specifies:

"A taxpayer must capitalize amounts paid to a governmental agency to obtain,

renew, renegotiate, or upgrade its rights under a trademark, trade name, copyright,

license, permit, franchise, or other similar right granted by that governmental

agency."  Whether an amount is paid to create an intangible under paragraph (d) is

determined on the basis of "all of the facts and circumstances, disregarding

---

[6]A special 12-month rule applies to the created intangibles identified in sec. 1.263(a)-4(d), Income Tax Regs.  Pursuant to that rule, "a taxpayer is not required to capitalize under this section amounts paid to create (or to facilitate the creation of) any right or benefit for the taxpayer that does not extend beyond the earlier of--(I) 12 months after the first date on which the taxpayer realizes the right or benefit; or (ii) The end of the taxable year following the taxable year in which the payment is made."  Id. para. (f)(1).  The rule is subject to various exceptions, including for "amounts paid to create (or facilitate the creation of) an intangible that constitutes an amortizable section 197 intangible within the meaning of section 197(c)."  Id. subpara. (3).

- 23 -

distinctions between the labels used in this paragraph (d) to describe the intangible and the labels used by the taxpayer and other parties to the transaction."  Id. subpara. (1).

As also germane to these cases, section 1.263(a)-4(d)(9)(I), Income Tax Regs., provides that a "taxpayer must capitalize amounts paid to another party to defend or perfect title to intangible property if that other party challenges the taxpayer's title to the intangible property."  As described in the preamble to the proposed regulations, "[t]his is consistent with existing regulations" and "is not intended to require capitalization of amounts paid to protect the property against infringement and to recover profits and damages as a result of infringement."  67 Fed. Reg. 77705 (Dec. 19, 2002).  "As under current law, these costs are generally deductible."  Id. (citing Urquhart v. Commissioner, 215 F.2d 17 (3d Cir. 1954), rev'g 20 T.C. 944 (1953)); see also T.D. 9107, 2004-1 C.B. 447, 450 ("The final regulations retain the rule contained in the proposed regulations.").

## 2.    Facilitative Costs

The direct costs of creating intangibles are not the only costs that must be capitalized under section 1.263(a)-4, Income Tax Regs.  Taxpayers are further required to capitalize any amounts "paid to facilitate * * * an acquisition or creation" of, among other things, an intangible described in paragraph (d).  Id.

**A23**

- 24 -

para. (b)(1)(v).  This provision "recognizes that capitalization is required not only for the cost of an asset itself, but for the ancillary expenditures incurred in acquiring, creating, or enhancing the intangible asset."  67 Fed. Reg. 77705 (citing Woodward v. Commissioner, 397 U.S. 572 (1970)).

"[A]n amount is paid to facilitate the acquisition or creation of an intangible (the transaction) if the amount is paid in the process of investigating or otherwise pursuing the transaction."  Sec. 1.263(a)-4(e)(1)(I), Income Tax Regs.  Whether an amount is "paid in the process of investigating or otherwise pursuing" a given transaction "is determined * * * [on the basis of] all of the facts and circumstances."  Id.  "[T]he fact that the amount would (or would not) have been paid but for the transaction is relevant, but is not determinative."  Id.  For purposes of this inquiry, "the term transaction means all of the factual elements comprising an acquisition or creation of an intangible and includes a series of steps carried out as part of a single plan."  Id. subpara. (3).

C.    Litigation Expenses

The deductibility of a legal expense generally depends upon the origin and character of the claim with respect to which the expense was incurred.  See United States v. Hilton Hotels Corp., 397 U.S. 580, 583 (1970); Woodward v. Commissioner, 397 U.S. at 577-578; United States v. Gilmore, 372 U.S. 39, 48-49

**A24**

- 25 -

(1963); see also Wellpoint, Inc. v. Commissioner, 599 F.3d 641, 647 (7th Cir.

2010), aff'g T.C. Memo. 2008-236; Newark Morning Ledger Co. v. United States,

539 F.2d 929, 935 (3d Cir. 1976).  Under this "origin of the claim" test, "the

substance of the underlying claim or transaction out of which the expenditure in

controversy arose governs whether the item is a deductible expense or a capital

expenditure, regardless of the motives of the payor or the consequences that may

result from the failure to defeat the claim."  Santa Fe Pac. Gold Co. v.

Commissioner, 132 T.C. at 264-265; see also Woodward v. Commissioner, 397

U.S. at 578.  "Thus, legal expenses directly connected with (or pertaining to) the

taxpayer's trade or business are deductible under Section 162 as ordinary and

necessary business expenses", while "expenses arising out of the acquisition,

improvement or ownership of property are capital expenditures under

Section 263(a) and are not currently deductible."  Meade Emory et al., "Legal

Expenses of Patent Defense Held Deductible", 70 J. Tax'n 180 (1989); see also

Am. Stores Co. v. Commissioner, 114 T.C. at 468 (citing Commissioner v.

Heininger, 320 U.S. 467 (1943), Commissioner v. Tellier, 383 U.S. 687, 689-690

(1966), and INDOPCO, Inc., v. Commissioner, 503 U.S. at 83).

- 26 -

Patent law has long distinguished suits for the defense of title to intellectual property from patent infringement litigation.[7]  The former involves the disposition or acquisition of a capital asset, and expenses in litigating such a suit have been treated as capital--even before the Supreme Court embraced the origin of the claim test.  See, e.g., Estate of Baier v. Commissioner, 533 F.2d 117, 120 (3d Cir. 1976) (holding that litigation expenses incurred incident to a dispute over the terms of a disposition are capital), aff'g 63 T.C. 513 (1975); Urquhart v. Commissioner, 215 F.2d at 19-20; Safety Tube Corp. v. Commissioner, 168 F.2d 787 (6th Cir. 1948) (requiring legal fees to be capitalized where controversy involved title and ownership of a patent), aff'g 8 T.C. 757 (1947).

Patent infringement litigation is a different creature altogether, sounding in tort.  See Schillinger v. United States, 155 U.S. 163, 169 (1894); Giesecke+Devrient GmbH v. United States, 150 Fed. Cl. 330, 344 (2020).  Such "litigation is a far cry from removing a cloud of title, or defending ownership of property."  Urquhart v. Commissioner, 215 F.2d at 20.  Usually "what a patent

---

[7]While recognizing the nonprecedential nature of most forms of IRS administrative guidance, see sec. 6110(k)(3), we note that the IRS has recognized this distinction as well, see, e.g., 67 Fed. Reg. 77705 (Dec. 19, 2002) (citing Urquhart v. Commissioner, 215 F.2d 17 (3d Cir. 1954), rev'g 20 T.C. 944 (1953)); Priv. Ltr. Rul. 201536006 (Sept. 4, 2015); Field Serv. Advisory 199925012 (June 25, 1999) ("[A]n acceptance by the Service of Urquhart has developed."); Tech. Adv. Mem. 8831001 (Apr. 8, 1988).

- 27 -

owner loses from infringement is the acquisition of 'a just and deserved gain' from the exploitation of the invention embodied in his patent." Mathey v. Commissioner, 177 F.2d 259, 263 (1st Cir. 1949) (quoting 3 Walker on Patents (Deller's Ed.) § 281), aff'g 10 T.C. 1099 (1948).  Therefore, "an award of damages in patent [infringement] litigation is ordinarily an award of compensation for gains or profits lost by the patent owner and hence is taxable to him as income in the year received." Id.

As the U.S. Court of Appeals for the Third Circuit, to which an appeal in these cases would lie absent a stipulation to the contrary, see sec. 7482(b)(1)(B), has observed, litigation expenses for taxpayers "engaged in the business of exploiting and licensing patents * * * are peculiarly normal" to their business, Urquhart v. Commissioner, 215 F.2d at 19.  "[F]or taxpayers engaged in the trade or business of creating and licensing intangible assets, the costs incurred in prosecuting an action for * * * infringement will most likely be deductible as a business expense."  Phillip F. Postlewaite et al., Federal Income Taxation of Intellectual Properties & Intangible Assets, para. 1.03 (2021), 1998 WL 1038665.

Moreover, costs incurred by a business to defend against tort claims generally have been held deductible for the current taxable year.  See, e.g., Kornhauser v. United States, 276 U.S. 145, 153 (1928).  Both we and our

- 28 -

predecessor have permitted the deduction of costs incurred in defending patent

infringement suits.  See F. Meyer & Bro. Co. v. Commissioner, 4 B.T.A. 481, 482

(1926) (holding that amount paid by defendant in patent infringement suit for an

accounting was an ordinary and necessary expense); Addressograph-Multigraph

Corp. v. Commissioner, a Memorandum Opinion of this Court dated Feb. 5, 1945,

4 T.C.M. (CCH) 147, 166 (1945) (upholding treatment of amounts incurred in

defending patent infringement suits as ordinary and necessary business expenses).

The deductibility of these expenses is consistent with the treatment of damages

paid in the wake of such litigation.  Schnadig Corp. v. Gaines Mfg. Co., 620 F.2d

1166, 1169 (6th Cir. 1980) ("When an infringer is required to pay damages to a

design patentee, the amount so paid is deductible from his income tax.").

II.    Analysis

In these cases, the parties dispute whether the legal fees at issue were

incurred to facilitate the acquisition of a right obtained from a Government

agency.  We will begin by identifying the underlying transaction, i.e., the

acquisition of the right, before determining whether the respective fees were paid

in the process of investigating or otherwise pursuing that transaction.

- 29 -

A.    <u>The Transaction</u>

The parties before us both describe the relevant transaction as the acquisition of an FDA-approved ANDA with a paragraph IV certification. However, the parties ascribe very different meanings to this general formulation. Mylan asserts that the acquisition of an FDA-approved ANDA with a paragraph IV certification occurs when the FDA completes its scientific and technical review and issues either a tentative or final approval letter. The Commissioner asserts that the acquisition of an FDA-approved ANDA with a paragraph IV certification refers to obtaining effective approval of an ANDA with a paragraph IV certification.

The Commissioner's interpretation is the more persuasive. Section 1.263(a)-4(b)(i)(v), Income Tax Regs., requires capitalization of amounts paid to facilitate the acquisition or creation of an intangible. As relevant here, created intangibles include "certain rights obtained from a governmental agency", such as "rights under a trademark, trade name, copyright, license, permit, franchise, or other similar right granted by that governmental agency." <u>Id.</u> para. (d)(5)(i).[8]

---

[8]Neither party contends that FDA-approved ANDAs are subject to the 12-month rule of sec. 1.263(a)-4(f), Income Tax Regs.  We therefore do not

(continued...)

**A29**

- 30 -

Although the "FDA will approve an * * * [ANDA] and send the applicant an approval letter" as long as it satisfies the scientific and technical requirements set forth in 21 C.F.R. sec. 314.127, see 21 C.F.R. sec. 314.105(d); see also 21 U.S.C. sec. 355(j)(4), this approval does not confer any rights on an applicant until it becomes "effective", see 21 U.S.C. sec. 355(j)(5)(B); 21 C.F.R. sec. 314.107(a). Only at that point does the right attach, which then allows for a generic drug to be "introduced or delivered for introduction into interstate commerce".  21 C.F.R. sec. 314.107(a); see also 21 U.S.C. sec. 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug.").

Mylan has not shown, and we have not found, any authority demonstrating that approval before it becomes effective confers rights equivalent to "rights under a trademark, trade name, copyright, license, permit, franchise, or other similar right granted by that governmental agency."  Sec. 1.263(a)-4(d)(5)(i), Income Tax Regs.  We accordingly adopt the Commissioner's interpretation of the transaction.

---

[8](...continued)
address the application vel non of that rule to these cases.

- 31 -

B.    Relevant Legal Fees

1.    Paragraph IV Notice Letters

We next consider the proper characterization of the legal fees Mylan

incurred during 2012 through 2014 to prepare notice letters relating to its filing of

ANDAs with paragraph IV certifications.  An applicant for an ANDA with a

paragraph IV certification "shall give notice" to "each owner of the patent that is

the subject of the certification" and the holder of the NDA with respect to the

brand name drug covered by such patents.  21 U.S.C. sec. 355(j)(2)(B)(iii).  The

notice is required to inform the recipients of the ANDA submission and to explain

in detail "the factual and legal basis of the opinion of the applicant that the patent

is invalid or will not be infringed."  Id. cl. (iv).  After providing that notice, the

applicant is required to submit an amendment to its ANDA reflecting that the

notice had been given.  See 21 C.F.R. sec. 314.95(b).

This notice requirement is also a part of the ANDA itself.  Under 21 U.S.C.

sec. 355(j)(2)(B)(i), the applicant that makes a paragraph IV certification "shall

include" in its ANDA a statement that the applicant "will give notice" as outlined

in 21 U.S.C. sec. 355(j)(2)(B).  And failure to provide such notice has tangible

consequences as "certifications become effective only upon notification."

Purepac, 354 F.3d at 890.

- 32 -

The notice described above thus is a required step in securing an

FDA-approved ANDA for those applicants that make a paragraph IV certification.

Sec. 1.263(a)-4(e)(3), Income Tax Regs.  Although Mylan argues that the notice

serves to facilitate patent litigation, Congress has made the notice a prerequisite

for ANDA approval.  Consequently, the legal expenses Mylan incurred to prepare,

assemble, and transmit such notice letters constitute amounts incurred

"investigating or otherwise pursuing" the transaction of creating FDA-approved

ANDAs, id. subpara. (1)(i), and must be capitalized, see also id. para. (l), Example

(1) (concluding that payments to outside counsel to prepare license application

facilitated the creation of an intangible).

### 2.    Section 271(e)(2) Litigation Expenses

We reach a different conclusion with respect to Mylan's Section 271(e)(2)

litigation expenses incurred during the years at issue.  In the Hatch-Waxman Act,

Congress sought to encourage the entry of low-cost generic drugs into the

marketplace while softening the risk to cost-intensive innovation by giving brand

name drug manufacturers the opportunity to avail themselves of patent law

protections before sustaining damages.  Among other changes made to accomplish

these objectives, the Hatch-Waxman Act moved up the timeline of patent litigation

with respect to generic copies of brand name drugs subject to a patent listed in the

- 33 -

Orange Book.  Although the filing of an ANDA with a paragraph IV certification

triggers the opportunity for patent litigation as well as the FDA review process,

this statutory design does not transform patent litigation into a step in the ANDA

approval process.  The patent litigation expenses at issue accordingly are not

subject to capitalization.

a.    Hatch-Waxman Regime

We start by considering the ANDA approval process.  The FDA reviews an

ANDA to ensure that certain safety standards are met and that the generic copy has

the same active ingredients as, and is "bioequivalent" to, the approved brand name

drug.  See 21 U.S.C. sec. 355(j)(2)(A), (4); see also Actavis, 570 U.S. at 142;

Caraco, 566 U.S. at 404-405.  According to 21 U.S.C. sec. 355(j)(4), the FDA

"shall approve" an ANDA unless it fails to satisfy certain technical requirements

enumerated in the statute and accompanying regulations, including failure to show

that the generic has the same active ingredients as the brand name drug, failure to

show bioequivalence between the drugs, failure to establish that the production

methods would preserve the generic's identity, strength, quality, and purity, and

failure to show proper labeling.  See also 21 C.F.R. secs. 314.105(d), 314.127.

The outcome of a Section 271(e)(2) suit has no bearing on the FDA's safety

and bioequivalence review.  The FDA continues its review process during the

- 34 -

pendency of the patent infringement suit and may issue a tentative or final

approval before the suit is resolved.  The FDA does not analyze patent issues as

part of its review, and neither the statute nor regulations suggest that patent issues

might block approval of an ANDA.  And winning a patent litigation suit does not

ensure that the generic drug manufacturer will receive approval, as the FDA can

disapprove an ANDA for not meeting safety and bioequivalence standards.

21 U.S.C. sec. 355(j)(4)(F).

A review of the patent litigation framework implemented by the

Hatch-Waxman Act likewise fails to suggest that such litigation is an element of

the approval process for ANDAs with paragraph IV certifications.  "[T]o guard

against infringement of patents relating to * * * [brand name] drugs", Eli Lilly,

496 U.S. at 676-677, Congress devised a system where a certification that a patent

covering the brand name drug is invalid or not infringed "automatically counts as

patent infringement", Actavis, 570 U.S. at 143.  The new cause of action

embodied in Section 271(e)(2) was a direct response to Congress' decision to end

the prohibition on use of brand name pharmaceuticals for research and

development before the expiration of patents covering such pharmaceuticals.  See

- 35 -

35 U.S.C. sec. 271(e)(1).[9]  The technical act of infringement provided an earlier

trigger for a patent suit "so that courts could promptly resolve infringement and

validity disputes before the ANDA applicant had engaged in the traditional

statutorily defined acts of infringement."  AstraZeneca Pharms. LP v. Apotex

Corp., 669 F.3d 1370, 1377 (Fed. Cir. 2012); see also Bristol-Myers Squibb Co. v.

Royce Labs., Inc., 69 F.3d 1130, 1135 (Fed. Cir. 1995) (holding that a

Section 271(e)(2) suit makes "it possible for a patent owner to have the court

determine whether, if a particular drug were put on the market, it would infringe

the relevant patent").

Although the Hatch-Waxman Act moved up the timing of patent litigation,

its character remained unchanged.  "Notwithstanding th[e] defined act of

infringement, a district court's inquiry in a suit brought under § 271(e)(2) is the

same as it is in any other infringement suit, viz., whether the patent in question is

'invalid or will not be infringed by the manufacture, use, or sale of the drug for

which the * * * [ANDA] is submitted.'"  Glaxo, 110 F.3d at 1569 (quoting 21

_____

[9]"For those who consider legislative history relevant," Warger v. Shauers,
574 U.S. 40, 48 (2014), in its report on the bill proposing what became the Hatch-
Waxman Act, the House Energy & Commerce Committee stated that "[t]he
purpose of sections 271(e)(1) and (2) is to establish that experimentation with a
patented drug product, when the purpose is to prepare for commercial activity
which will begin after a valid patent expires, is not a patent infringement", H.R.
Rept. No. 98-857 (Part 1), at 45 (1984), 1984 U.S.C.C.A.N. 2647, 2678.

- 36 -

U.S.C. sec. 355(j)(2)(A)(vii)(IV)); see also Alcon Research Ltd. v. Barr Labs.,

Inc., 745 F.3d 1180, 1186 (Fed. Cir. 2014); Abbott Labs. v. TorPharm, Inc., 300

F.3d 1367, 1373 (Fed. Cir. 2002).[10] "The only difference in actions brought under

§ 271(e)(2) is that the allegedly infringing drug has not yet been marketed and

therefore the question of infringement must focus on what the ANDA applicant

will likely market if its application is approved, an act that has not yet occurred."

Glaxo, 110 F.3d at 1569.

The Commissioner counters that a Section 271(e)(2) suit is a step in

obtaining effective approval of an ANDA with a paragraph IV certification.  He

asserts that the Hatch-Waxman regime incentivized the filing of ANDAs with

paragraph IV certifications by the prospect of market entry before patent

expiration and lucrative first-to-file exclusivity and that Section 271(e)(2) suits

ineluctably followed.  We are not persuaded.  Although Congress erected a

framework that promotes the prompt resolution of patent issues, aaiPharma, 296

F.3d at 232, the Commissioner fails to demonstrate how encouraging early and

---

[10]Again, for those who wish to consider legislative history, the House
Energy & Commerce Committee noted in its report that "[t]he provisions of this
bill relating to the litigation of disputes involving patent validity and infringement
are not intended to modify existing patent law with respect to the burden of proof
and the nature of the proof to be considered by the courts in determining whether a
patent is valid or infringed."  H.R. Rept. No. 98-857 (Part 1), supra at 28, 1984
U.S.C.C.A.N. at 2661.

- 37 -

expeditious patent litigation shows that such litigation is an element of acquiring effective FDA approval of an ANDA with a paragraph IV certification.

The Commissioner also points to statutory provisions linking the effective date of approval to the outcome of Section 271(e)(2) suits as supporting his view. As an initial matter, we note that a Section 271(e)(2) suit is not required to obtain effective approval of an ANDA with a paragraph IV certification, see 21 U.S.C. sec. 355(j)(5)(B)(iii), and that a brand name drug manufacturer is under no obligation to initiate such a suit in response to an ANDA with a paragraph IV certification.  Both of these points belie the idea that a Section 271(e)(2) suit is a step in obtaining an effective FDA approval.

Title 21 sec. 355(j)(5)(B)(iii), on which the Commissioner relies, does not suggest a different result.  Where "the courts decide the matter within * * * [the 30-month stay] period, the FDA follows that determination; if they do not, the FDA may go forward and give approval to market the generic product." Actavis, 570 U.S. at 143.  Title 21 sec. 355(j)(5)(B)(iii) thus ties the effective date to the outcome of a Section 271(e)(2) suit.

Congress' decision to coordinate effective FDA approval with the outcome of a Section 271(e)(2) suit does not convert such litigation into a link in the ANDA approval chain.  To the contrary, a Section 271(e)(2) suit serves the same

- 38 -

function as a normal patent infringement suit under 35 U.S.C. sec. 271(a), namely, allowing patent holders the opportunity to vindicate their intellectual property rights.  Moreover, the primary relief available in a Section 271(e)(2) suit, i.e., prohibiting introduction of the infringing product into the market until expiration of the applicable patent, is the same relief available in a normal patent infringement suit (through an injunction), only tailored for the unique context where the infringing product has not yet been introduced into the market.  See 35 U.S.C. sec. 271(e)(4)(A).[11]  The statutory coordination between the outcome of Section 271(e)(2) litigation and FDA effective approval ensures that the FDA does not run afoul of a District Court's resolution of the intellectual property rights of the parties when deciding whether to grant approval.  See Caraco, 566 U.S. at 405 ("[T]he FDA cannot authorize a generic drug that would infringe a patent[.]").

Section 271(e)(2) litigation is a vehicle built for the patent holder.  It is the patent holder that has the choice to bring litigation within 45 days of notice, with the consequences described in 21 U.S.C. sec. 355(j)(5)(B)(iii).  The legal expenses

---

[11]We note that this point was made by Representative Henry Waxman before the enactment of the Hatch-Waxman Act, for those who find such statements worth considering.  See 130 Cong. Rec. 24427 (1984) (statement of Rep. Henry Waxman).  Mr. Waxman observed that, under then-current patent law, "if someone markets a competitive product, * * * [brand name drug manufactures] can go to court and sue for an injunction, or they can sue for treble damages for infringement of that patent."  Id.

- 39 -

incurred in defending such suits relate to determining the patent holders'

intellectual property rights with respect to brand name drugs.  Absent the filing of

such a suit by a patent holder, the generic drug manufacturer is under no

obligation to demonstrate that a patent is invalid or not infringed to obtain FDA

approval.  In other words, a patent on a brand name drug presents no impediment

to FDA approval of a generic version unless the patent holder decides to take

advantage of the mechanism Congress provided for an early adjudication of the

patent holder's rights.[12]  We cannot conclude that such litigation--controlled by

and primarily benefiting patent holders--is a step in the FDA approval process for

the generic drug.

As a final matter, section 1.263(a)-4(e)(1)(i), Income Tax Regs., identifies

"the fact that the amount would (or would not) have been paid but for the

---

[12]Our view on this point is consistent with that expressed by Representative
Waxman, again for those who consider such statements.  In responding to an
objection to the 30-month stay, Mr. Waxman noted that "[t]he facts of life are that
a generic drug manufacturer will await, as a practical matter, until the decision of a
court on a patent challenge before that manufacturer markets a generic drug."  130
Cong. Rec. 24427.  He continued that "[t]he 30-month period is one that gave
further assurance to the brand-name drug manufacturer that the generic drug
manufacturer would not put his competitor on th[e] market until that court
decision came through."  Id.  Mr. Waxman did not suggest either that the patent
litigation is connected with obtaining FDA approval, or that the 30-month stay
was more than reassurance to brand name drug manufacturers in the patent
context.

- 40 -

transaction" as a relevant, although not dispositive, factor in evaluating whether an expense facilitates a transaction.  On a surface level, this factor appears to weigh in favor of the Commissioner's position:  absent the transaction to obtain FDA approval, the generic drug manufacturer would not make a paragraph IV certification, the patent holder would not initiate a Section 271(e)(2) suit, and the generic drug manufacturer would not incur litigation expenses defending that suit.  Nonetheless "a district court's inquiry in a suit brought under § 271(e)(2) is the same as is in any other infringement suit".  Glaxo, 110 F.3d at 1569.  Even absent the transaction, the patent holder would doubtless seek to defend its intellectual property against a potential infringer, and the generic manufacturer would incur the same litigation costs in defending such suit.  We are not persuaded that the litigation expenses would not have been incurred but for the transaction.[13]

In summary, the Hatch-Waxman Act made coordinated changes to several areas of law, including the FDA approval process and patent law, to serve its goals of encouraging the entry of low-cost generic drugs into the marketplace while affording patent protections to brand name drug manufacturers.  See, e.g., In re

---

[13] Again, for those who wish to consider Mr. Waxman's views on this point, he noted that under then-current patent law, "if someone markets a competitive product, * * * [brand name drug manufacturers] can go to court and sue for an injunction, or they can sue for treble damages for infringement of that patent." 130 Cong. Rec. 24427.

- 41 -

Lipitor, 868 F.3d at 240; Am. Bioscience, 269 F.3d at 1079.  Despite the

coordination devised by Congress, Section 271(e)(2) litigation is not a step in

obtaining effective FDA approval of an ANDA with a paragraph IV certification.

Accordingly, expenses Mylan incurred in defending Section 271(e)(2) suits were

not "paid to facilitate" the transaction and are not required to be capitalized.

                    b.       Origin of the Claim

        The origin of the claim test likewise indicates that Section 271(e)(2)

litigation expenses should be treated as deductible ordinary and necessary business

expenses.  Under this test, we inquire "whether the origin of the claim litigated is

in the process of acquisition", enhancement, or other disposition of a capital asset.

Woodward v. Commissioner, 397 U.S. at 577; see also Santa Fe Pac. Gold Co. v.

Commissioner, 132 T.C. at 264-265.

        The legal expenses at issue arose out of actions initiated by patent holders to

protect their intellectual property from infringement and exploitation.  See, e.g.,

Glaxo, 110 F.3d at 1569 ("[A] district court's inquiry in a suit brought under

§ 271(e)(2) is the same as it is in any other infringement suit, viz., whether the

patent in question is 'invalid or will not be infringed by the manufacture, use, or

sale of the drug for which the * * * [ANDA] is submitted.'" (quoting 21 U.S.C.

sec. 355(j)(2)(A)(vii)(IV))).  Patent infringement suits are creatures of tort,

**A41**

- 42 -

Schillinger, 155 U.S. at 169; Giesecke+Devrient GmbH, 150 Fed. Cl. at 344, with

an aim of preventing and recovering damages to the patent holder's business of

exploiting its patent, see Urquhart v. Commissioner, 215 F.2d at 20.

The U.S. Court of Appeals for the Third Circuit has previously explained

the proper treatment of expenses incurred in litigating an infringement suit. See

id. at 18-19.  In that case the taxpayers attempted to deduct various legal expenses

associated with patent infringement litigation, and the IRS disallowed the

deductions on the ground that they were capital expenditures for the protection or

perfection of property rights.  Id.  We sustained the IRS' determination.  Urquhart

v. Commissioner, 20 T.C. 944.  The Third Circuit disagreed, pointing out that

patent infringement "litigation is a far cry from removing a cloud of title, or

defending ownership of property."  Urquhart v. Commissioner, 215 F.2d at 20.  It

reasoned that the litigation instead "arose out of and related directly to the

exploitation of the invention embodied in the patent" and thus held that the

litigation expenses were incurred not to defend or protect title but rather, "to

prevent (and recover) damage to their business, that is, to protect, conserve and

maintain their business profits."  Id.[14]  The Department of the Treasury explicitly

_____

[14]Although Urquhart preceded Woodward v. Commissioner, 397 U.S. 572
(1970), by nearly 20 years, we note that the Third Circuit's analysis of the

(continued...)

**A42**

- 43 -

endorsed the Third Circuit's holding in <u>Urquhart</u> in the preamble to its proposed

regulations on the capitalization of intangible assets.  <u>See</u> 67 Fed. Reg. 77705

(noting that the proposed regulation was consistent with "existing regulations" and

"current law" and "is not intended to require capitalization of amounts paid to

protect the property against infringement").

The litigation expenses at issue here likewise arose out of patent

infringement claims.  <u>See</u> <u>Santa Fe Pac. Gold Co. v. Commissioner</u>, 132 T.C.

at 264-265 ("[T]he <u>substance</u> of the underlying claim or transaction out of which

the expenditure in controversy arose governs whether the item is a deductible

expense or a capital expenditure[.]" (Emphasis added.)).  Under the reasoning of

<u>Urquhart</u>, the litigation expenses of the patent holders that initiated infringement

suits against Mylan seem clearly deductible.

We see no reason that Mylan should face different treatment.  Expenses

incurred in defending patent infringement claims have been found deductible in

the past.  <u>See</u> <u>F. Meyer & Bro. Co. v. Commissioner</u>, 4 B.T.A. at 482;

<u>Addressograph-Multigraph Corp. v. Commissioner</u>, 4 T.C.M. (CCH) at 166.

Although Section 271(e)(2) litigation usually occurs before marketing and sale of

---

[14](...continued)
litigation expenses perceptively anticipated the origin of the claim test that the
Supreme Court adopted.

- 44 -

the generic drug, the purpose of the suit remains to protect future business profits.[15]  Cf. Urquhart, 215 F.2d at 20; Mathey v. Commissioner, 177 F.2d at 263. We conclude that the litigation expenses that Mylan incurred in defending Section 271(e)(2) suits arose out of the ordinary and necessary activities of its generic drug business and accordingly are deductible.  See Am. Stores Co. v. Commissioner, 114 T.C. at 468.

In short, the Commissioner fails to convince us that the substance of the underlying claim arises out of the acquisition, ownership, or improvement of property as might support the capitalization of Mylan's Section 271(e)(2) litigation expenses.  Indeed, we struggle to see the nature of the property right that the Commissioner has in mind.  Although a generic drug manufacturer must assert in an ANDA with a paragraph IV certification that listed patents covering the brand name drug are invalid or not infringed by the generic version, the manufacturer is not required to undertake affirmative litigation to establish that point as a condition of entering its generic on the market.  It thus does not appear

---

[15]Where a generic drug has been launched "at risk," i.e., after the conclusion of the 30-month stay but before the resolution of the litigation, the plaintiff in the Section 271(e)(2) suit may seek damages as in a normal infringement suit.  See 35 U.S.C. sec. 271(e)(4)(C).  As explained, such infringement damages have been treated as deductible business expenses of the infringing party.  See Schnadig Corp. v. Gaines Mfg. Co., 620 F.2d 1166, 1169 (6th Cir. 1980).

- 45 -

that Section 271(e)(2) litigation relates to the acquisition or enhancement of any right of a generic drug manufacturer, such that the expenses incurred in that litigation must be capitalized.  This litigation instead gives the brand name drug manufacturer a chance to protect its intellectual property.  In this circumstance, the origin of the claim test suggests that Mylan's litigation expenses are deductible.

c.   Regulatory Examples

Certain examples set forth in sections 1.263(a)-4(e) and 1.263(a)-5(l), Income Tax Regs., illustrating the scope of the term "facilitate" in section 1.263(a)-4(e)(1)(i), Income Tax Regs., offer further support for our conclusion.  As an initial matter, the parties spar over whether we should consider the regulations set forth in section 1.263(a)-5(l), Income Tax Regs., which address the treatment of "[a]mounts paid or incurred to facilitate an acquisition of a trade or business, a change in the capital structure of a business entity, and certain other transactions", given that the issue before us relates to section 1.263(a)-4(e), Income Tax Regs., which bears on "[a]mounts paid to create or acquire intangibles" as applies to our cases.  Both provisions include a nearly identical description of the term "facilitate", and we will consider the regulatory examples to the extent they illuminate the common term.

- 46 -

We believe that the most apposite example is section 1.263(a)-5(l), Example (18)(i), Income Tax Regs.  This example discusses the treatment of legal fees paid in connection with bankruptcy proceedings implicating tort liability of the taxpayer.  It provides:

> X corporation is the defendant in numerous lawsuits alleging tort liability based on X's role in manufacturing certain defective products.  X files a petition for reorganization under Chapter 11 of the Bankruptcy Code in an effort to manage all of the lawsuits in a single proceeding.  X pays its outside counsel to prepare the petition and plan of reorganization, to analyze adequate protection under the plan, to attend hearings before the Bankruptcy Court concerning the plan, and to defend against motions by creditors and tort claimants to strike the taxpayer's plan.  [Id.]

The example concludes, in relevant part, that the legal expenses paid by X "to prepare, analyze or obtain approval of the portion of X's plan of reorganization that resolves X's tort liability do not facilitate the reorganization and are not required to be capitalized, provided that such amounts would have been treated as ordinary and necessary business expenses under section 162 had the bankruptcy proceeding not been instituted."  Id. Example (18)(ii).  We see a strong parallel here, where patent litigation is connected with but distinct from the broader project of obtaining effective FDA approval of ANDAs with paragraph IV certifications.  The conclusion reached by the example, i.e., that the separate litigation expenses should not be capitalized, thus attaches here.

- 47 -

The Commissioner argues that section 1.263(a)-4(e)(5), <u>Example</u> (<u>4</u>),
Income Tax Regs., provides the more apt comparison.  In that example U owns a
majority of the shares in T while M is a minority shareholder.  <u>See</u> <u>id.</u>  U and M
disagree over a perpetual extension of T's charter, which, under State law, requires
U to buy out M.  <u>See</u> <u>id.</u>  A dispute over the proper value of M's stock spawns
litigation and $25,000 in litigation expenses.  <u>See</u> <u>id.</u>  The example concludes that
the litigation expenses facilitate the acquisition of stock by helping to establish the
purchase price and thus must be capitalized.  <u>See</u> <u>id.</u>

Despite the complicated backdrop, the principle illustrated by this example
is straightforward:  litigation expenses incurred to establish a necessary element of
the transaction (i.e., the purchase price) facilitate it and are subject to
capitalization.  We believe the instant case is not comparable.  The patent
litigation expenses were not incurred in connection with a necessary element of
obtaining effective FDA approval but to resolve the question of patent rights.  As
such, the example finds no purchase here.

C.    <u>Conclusion</u>

We hold that the disputed legal expenses that Mylan incurred during the
years at issue to prepare paragraph IV notice letters must be capitalized pursuant
to section 263(a), whereas expenses incurred to litigate Section 271(e)(2) suits are

- 48 -

currently deductible pursuant to section 162(a).  The IRS' determinations as set

forth in the notices of deficiency are accordingly sustained for amounts incurred to

prepare paragraph IV notice letters.

III.    Amortization of Mylan's Legal Expenses

Lastly we turn briefly to the amortization (that is, the incremental recovery)

of Mylan's expenses for the years at issue.  Though Mylan has raised various

concerns regarding the equitable and policy implications of requiring generic drug

manufacturers to recover their legal expenses over a 15-year term, we understand

Mylan's arguments to be geared toward advocating its general position that its

expenses are not capital expenditures.

When the IRS determined to disallow Mylan's deductions, part of its

determination reflected that Mylan's expenses were subject to amortization over a

15-year period pursuant to section 197.  See sec. 197(a).  In general, where

section 197 applies, no other method of depreciation or amortization is permitted.

Id. subsec. (b).

Mylan does not contest in its posttrial briefing the substance of the IRS'

determination that, assuming Mylan's expenses were capital, section 197 provides

the method for amortization of those expenses.  Mylan is therefore deemed to have

conceded the section 197 amortization issue.  See Mendes v. Commissioner, 121

- 49 -

T.C. 308, 312-313 (2003); <u>Leahy v. Commissioner</u>, 87 T.C. 56, 73-74 (1986); <u>see</u>

<u>also</u> <u>Ohde v. Commissioner</u>, T.C. Memo. 2017-137, at *2 n.2.  We accordingly

sustain the IRS' determination that Mylan's expenses fall within the bounds of

section 197.

IV.    <u>Conclusion</u>

In sum Mylan is liable for tax deficiencies as to amounts incurred to prepare

paragraph IV notice letters for its 2012, 2013, and 2014 taxable years.

To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.

85

# UNITED STATES TAX COURT

| | |
|---|---|
| MYLAN, INC. & SUBSIDIARIES, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Docket No.   26976-16 |
| | ) |
| COMMISSIONER OF INTERNAL REVENUE, | ) |
| | ) |
| | ) |
| Respondent. | ) |

## DECISION

Pursuant to the opinion of the Court filed April 27, 2021, and incorporating herein the facts recited in respondent's computation as the findings of the Court, it is

ORDERED AND DECIDED: That there is a deficiency in income tax due from petitioner for the taxable year 2014 in the amount of $1,231,359.00.

**(Signed) Patrick J. Urda**
**Judge**

\*     \*     \*     \*     \*

**Entered and Served 11/02/21**

A50

Docket No. 26976-16                    - 2 -

The parties stipulate that the foregoing decision is in accordance with the opinion of the Court and respondent's computation, and that the Court may enter this decision, without prejudice to the right of either party to contest the correctness of the decision entered herein.

The parties further stipulate that interest will be assessed as provided by law on the deficiency due from petitioner.

WILLIAM M. PAUL
Acting Chief Counsel
Internal Revenue Service

By:

WILLIAM F. NELSON
Counsel for Petitioner
Tax Court Bar No. NW0106
1111 Pennsylvania Avenue NW
Washington, DC  20004-2541
Telephone: (202) 373-6782
william.nelson@morganlewis.com

EMILY J. GIOMETTI
Special Trial Attorney
(Large Business & International)
Tax Court Bar No. GE0326
550 Main Street, Suite 9-351
Cincinnati, OH  45202
Telephone: (513) 975-6847
emily.j.giometti@irscounsel.treas.gov

Date:    10/21/2021

Date:    10/22/21

**A51**

83

# UNITED STATES TAX COURT

| | | |
|---|---|---|
| MYLAN, INC. & SUBSIDIARIES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Docket No. 26977-16 |
| | ) | |
| COMMISSIONER OF INTERNAL REVENUE, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

## DECISION

Pursuant to the opinion of the Court filed April 27, 2021, and incorporating herein the facts recited in respondent's computation as the findings of the Court, it is

ORDERED AND DECIDED: That there is a deficiency in income tax due from petitioner for the taxable year 2013 in the amount of $336,727.00.

**(Signed) Patrick J. Urda**
**Judge**

\*   \*   \*   \*   \*

Docket No. 26977-16                    - 2 -

The parties stipulate that the foregoing decision is in accordance with the opinion of the Court and respondent's computation, and that the Court may enter this decision, without prejudice to the right of either party to contest the correctness of the decision entered herein.

The parties further stipulate that interest will be assessed as provided by law on the deficiency due from petitioner.

                                        WILLIAM M. PAUL
                                        Acting Chief Counsel
                                        Internal Revenue Service

_____   By: _____
WILLIAM F. NELSON                     EMILY J. GIOMETTI
Counsel for Petitioner                Special Trial Attorney
Tax Court Bar No. NW0106              (Large Business & International)
1111 Pennsylvania Avenue NW           Tax Court Bar No. GE0326
Washington, DC  20004-2541            550 Main Street, Suite 9-351
Telephone: (202) 373-6782             Cincinnati, OH  45202
william.nelson@morganlewis.com        Telephone: (513) 975-6847
                                      emily.j.giometti@irscounsel.treas.gov

Date: _____10/21/2021_____        Date: _____10/22/21_____

**A53**

82

# UNITED STATES TAX COURT

| | |
|---|---|
| MYLAN, INC. & SUBSIDIARIES, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Docket No.     26978-16 |
| | ) |
| COMMISSIONER OF INTERNAL REVENUE, | ) |
| | ) |
| | ) |
| Respondent. | ) |

## DECISION

Pursuant to the opinion of the Court filed April 27, 2021, and incorporating herein the facts recited in respondent's computation as the findings of the Court, it is

ORDERED AND DECIDED: That there is a deficiency in income tax due from petitioner for the taxable year 2012 in the amount of $392,907.00.

**(Signed) Patrick J. Urda**
**Judge**

\*     \*     \*     \*     \*

**Entered and Served 11/02/21**                                        A54

Docket No. 26978-16          - 2 -

The parties stipulate that the foregoing decision is in accordance with the opinion of the Court and respondent's computation, and that the Court may enter this decision, without prejudice to the right of either party to contest the correctness of the decision entered herein.

The parties further stipulate that interest will be assessed as provided by law on the deficiency due from petitioner.

WILLIAM M. PAUL
Acting Chief Counsel
Internal Revenue Service

By:

WILLIAM F. NELSON
Counsel for Petitioner
Tax Court Bar No. NW0106
1111 Pennsylvania Avenue NW
Washington, DC  20004-2541
Telephone: (202) 373-6782
william.nelson@morganlewis.com

EMILY J. GIOMETTI
Special Trial Attorney
(Large Business & International)
Tax Court Bar No. GE0326
550 Main Street, Suite 9-351
Cincinnati, OH  45202
Telephone: (513) 975-6847
emily.j.giometti@irscounsel.treas.gov

Date:    10/21/2021

Date:    10/22/21

A55

Mylan, Inc. & Subsidiaries,

     Petitioner

v.

Commissioner of Internal Revenue

     Respondent

Electronically Filed

Docket No. 26976-16

# Notice of Appeal to 3rd Circuit

Mylan, Inc. & Subsidiaries,

     Petitioner

v.

Commissioner of Internal Revenue

     Respondent

Electronically Filed

Docket No. 26976-16

# Notice of Appeal

Mylan, Inc. & Subsidiaries,

    Petitioner

v.

Commissioner of Internal Revenue

    Respondent

Electronically Filed

Docket No. 26976-16

# Notice of Appeal

# UNITED STATES TAX COURT

| | | |
|---|---|---|
| MYLAN, INC. & SUBSIDIARIES | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Docket No. 26976-16 |
| | ) | |
| COMMISSIONER OF | ) | |
| INTERNAL REVENUE, | ) | Filed Electronically |
| | ) | |
| Respondent. | ) | |

## NOTICE OF APPEAL

Notice is hereby given that the Commissioner of Internal Revenue appeals to the United States Court of Appeals for the Third Circuit from the decision of this Court entered in the above-captioned proceeding on November 2, 2021.

Petitioner's principal place of business was in Canonsburg, Pennsylvania, at the time the petition was filed with the Tax Court. Accordingly, venue is properly placed with the United States Court of Appeals for the Third Circuit.

Docket No. 26976-16                  2

Dated: January 28, 2022

_____ FOR
DAVID A. HUBBERT
Deputy Assistant Attorney General
Tax Division
U.S. Department of Justice

_____ FOR
DRITA TONUZI
Deputy Chief Counsel (Operations)
Internal Revenue Service

_____
R. MATTHEW KELLEY
Special Counsel
(Income Tax & Accounting)
Tax Court Bar No. KR0667
1111 Constitution Ave., NW
Washington, D.C. 20224
Telephone: (202) 317-7002
R.Matthew.Kelley@irscounsel.treas.gov

_____
EMILY J. GIOMETTI
Special Trial Attorney
(Large Business & International)
Tax Court Bar No. GE0326
550 Main Street, Suite 9-351
Cincinnati, OH  45202
Telephone: (513) 975-6847
Emily.J.Giometti@irscounsel.treas.gov

Mylan, Inc. & Subsidiaries,

      Petitioner

      v.                                    Electronically Filed

Commissioner of Internal Revenue          Docket No. 26977-16

      Respondent

# Notice of Appeal to 3rd Circuit

Mylan, Inc. & Subsidiaries,

     Petitioner

v.

Commissioner of Internal Revenue

     Respondent

Electronically Filed

Docket No. 26977-16

# Notice of Appeal

A62

# UNITED STATES TAX COURT

| | | |
|---|---|---|
| MYLAN, INC. & SUBSIDIARIES | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Docket No. 26977-16 |
| | ) | |
| COMMISSIONER OF | ) | |
| INTERNAL REVENUE, | ) | Filed Electronically |
| | ) | |
| Respondent. | ) | |

## NOTICE OF APPEAL

Notice is hereby given that the Commissioner of Internal Revenue appeals to the
United States Court of Appeals for the Third Circuit from the decision of this
Court entered in the above-captioned proceeding on November 2, 2021.

Petitioner's principal place of business was in Canonsburg, Pennsylvania, at the
time the petition was filed with the Tax Court.  Accordingly, venue is properly
placed with the United States Court of Appeals for the Third Circuit.

**A63**

Docket No. 26977-16                    2

Dated: January 28, 2022

*[signature]* _____ FOR
DAVID A. HUBBERT
Deputy Assistant Attorney General
Tax Division
U.S. Department of Justice


*[signature]* _____ FOR
DRITA TONUZI
Deputy Chief Counsel (Operations)
Internal Revenue Service


*[signature]* _____
R. MATTHEW KELLEY
Special Counsel
(Income Tax & Accounting)
Tax Court Bar No. KR0667
1111 Constitution Ave., NW
Washington, D.C. 20224
Telephone: (202) 317-7002
R.Matthew.Kelley@irscounsel.treas.gov


*[signature]* _____
EMILY J. GIOMETTI
Special Trial Attorney
(Large Business & International)
Tax Court Bar No. GE0326
550 Main Street, Suite 9-351
Cincinnati, OH  45202
Telephone: (513) 975-6847
Emily.J.Giometti@irscounsel.treas.gov

**A64**

Mylan, Inc. & Subsidiaries,

      Petitioner

v.

Commissioner of Internal Revenue

      Respondent

Electronically Filed

Docket No. 26978-16

# Notice of Appeal to 3rd Circuit

Mylan, Inc. & Subsidiaries,

     Petitioner

     v.                                    Electronically Filed

Commissioner of Internal Revenue              Docket No. 26978-16

     Respondent

# Notice of Appeal

# UNITED STATES TAX COURT

| | | |
|---|---|---|
| MYLAN, INC. & SUBSIDIARIES | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Docket No. 26978-16 |
| | ) | |
| COMMISSIONER OF | ) | |
| INTERNAL REVENUE, | ) | Filed Electronically |
| | ) | |
| Respondent. | ) | |

## NOTICE OF APPEAL

Notice is hereby given that the Commissioner of Internal Revenue appeals to the United States Court of Appeals for the Third Circuit from the decision of this Court entered in the above-captioned proceeding on November 2, 2021.

Petitioner's principal place of business was in Canonsburg, Pennsylvania, at the time the petition was filed with the Tax Court. Accordingly, venue is properly placed with the United States Court of Appeals for the Third Circuit.

Docket No. 26978-16                2

Dated: January 28, 2022

                                             FOR

DAVID A. HUBBERT
Deputy Assistant Attorney General
Tax Division
U.S. Department of Justice

                                             FOR

DRITA TONUZI
Deputy Chief Counsel (Operations)
Internal Revenue Service

R. MATTHEW KELLEY
Special Counsel
(Income Tax & Accounting)
Tax Court Bar No. KR0667
1111 Constitution Ave., NW
Washington, D.C. 20224
Telephone: (202) 317-7002
R.Matthew.Kelley@irscounsel.treas.gov

EMILY J. GIOMETTI
Special Trial Attorney
(Large Business & International)
Tax Court Bar No. GE0326
550 Main Street, Suite 9-351
Cincinnati, OH  45202
Telephone: (513) 975-6847
Emily.J.Giometti@irscounsel.treas.gov

**A68**